**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IKB DEUTSCHE INDUSTRIEBANK AG,

Plaintiff,

- <em>against</em> -

McGRAW HILL FINANCIAL, INC. (f/k/a THE
McGRAW-HILL COMPANIES, INC. (d/b/a
STANDARD & POOR'S RATINGS SERVICES)),

Defendant.

Case No. 14-CV-3443 (JSR)

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS THE COMPLAINT**</u>

Of Counsel:  Floyd Abrams
             Dean Ringel
             Jason M. Hall
             Roxana Labatt

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Defendant*
*McGraw Hill Financial, Inc.*

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT AND FACTUAL BACKGROUND** ..................................... 1

**ARGUMENT** ..................................................................................................................... 4

**I.   ALL OF IKB'S CLAIMS MUST BE DISMISSED AS UNTIMELY UNDER THE APPLICABLE THREE-YEAR GERMAN STATUTE OF LIMITATIONS** ................. 4

    A.   Germany's Three-Year Statute of Limitations Applies to IKB's Claims ....................... 6

    B.   IKB's Claims in This Action Arose in 2007 and Certainly No Later than 2008 ............ 8

    C.   IKB Had Actual Knowledge of the Facts Underlying its Claims Against S&P Well Before December 31, 2009 ......................................................................................... 8

**II.  IKB DOES NOT AND CANNOT STATE A CLAIM FOR ANY OF ITS PURPORTED CAUSES OF ACTION** ........................................................................ 14

    A.   IKB Does Not and Cannot Plead the Reliance Element of Its Fraud and Negligent Misrepresentation Claims ......................................................................... 14

        1.   IKB's Insider Role as Manager and Sponsor of the Rhinebridge SIV Bars its Allegations of Reliance ............................................................................... 14

        2.   The Complaint Fails to State Facts Giving Rise to Actual or Reasonable Reliance as to Any of the Alleged Rhinebridge Note Purchases .......................... 16

        *a.   IKB Could Not have Actually Relied on S&P's Ratings in its Purchases of Junior Capital Notes or Senior Capital Notes Because S&P Never Rated those Notes* ........................................................................................................... 16

        *b.   As a Matter of Law, IKB Cannot Demonstrate Reliance on S&P's Ratings of Mezzanine Capital Notes Because IKB Committed to Buy Those Notes Long Before S&P Rated Them* ......................................................................... 17

        *c.   The Complaint Fails to Plead Sufficient Facts to Show Actual or Reasonable Reliance on S&P's Ratings of Commercial Paper* .................................... 18

    B.   IKB Fails to State a Claim With Respect to its Allegations of a "Civil Conspiracy" ... 21

**CONCLUSION** ................................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*200 East End Avenue Corp.* v. *General Electric Co.*,
172 N.Y.S.2d 409 (1st Dep't 1958), *aff'd* 6 N.Y.2d 731 (1959) ............................................15

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009)..................................................2n, 9, 12n, 13n

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
888 F. Supp. 2d 431 (S.D.N.Y. 2012)..................................................17

*Aetna Casualty & Surety Co.* v. *Aniero Concrete Co.*,
404 F.3d 566 (2d Cir. 2005)..................................................21

*Antone* v. *General Motors Corp., Buick Motor Division*,
473 N.E.2d 742 (N.Y. 1984)..................................................6

*Banque Franco-Hellenique de Commerce International et Maritime, S.A.* v. *Christophides*,
106 F.3d 22 (2d Cir. 1997)..................................................20

*Buechner* v. *Avery*,
836 N.Y.S.2d 1 (1st Dep't 2007) ..................................................15

*CIH International Holdings, LLC* v. *BT United States, LLC*,
821 F. Supp. 2d 604 (S.D.N.Y. 2011)..................................................5n

*Deutsche Zentral-Genossenchaftsbank AG* v. *HSBC North America Holdings, Inc.*,
2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) ..................................................5n

*Deutsche Zentral-Genossenschaftsbank AG, New York Branch* v. *UBS AG*,
2014 WL 1495632 (N.Y. Sup. Ct. Apr. 17, 2014), *amended on other grounds* 652575/2012
(N.Y. Sup. Ct. Apr. 23, 2014) Dkt. No. 95 ..................................................7

*Dexia SA/NV* v. *Bear, Stearns & Co.*,
929 F. Supp. 2d 231 (S.D.N.Y. 2013)..................................................1n, 20n

*Ferrera* v. *Fisher*,
2014 WL 1303436 (S.D.N.Y. Apr. 1, 2014)..................................................5n

*Global Financial Corp.* v. *Triarc Corp.*,
715 N.E.2d 482 (N.Y. 1999)..................................................6-7

*Hydro Investors, Inc.* v. *Trafalgar Power Inc.*,
227 F.3d 8 (2d Cir. 2000) ..................................................14n

*Jimenez* v. *Brazil Ethanol, Inc.*,
2012 WL 696396 (S.D.N.Y. Feb. 29, 2012)................................................................. 16-17

*Kirch* v. *Liberty Media Corp.*,
449 F.3d 388 (2d Cir. 2006)................................................................................................21

*Knox* v. *Countrywide Bank*,
2014 WL 946635 (E.D.N.Y. Mar. 12, 2014)......................................................................19

*Lerner* v. *Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)...............................................................................................17

*In re Livent Inc. Noteholders Securities Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001)................................................................................19

*In re Marsh & Mclennan Cos., Inc. Securities Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)..............................................................................14n

*In re Merrill Lynch & Co.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003)................................................................................1n

*O'Dell* v. *Ginsberg*,
677 N.Y.S.2d 544 (2nd Dep't 1998)...................................................................................17

*Olshansky* v. *Sutton*,
2001 WL 99857 (S.D.N.Y. Feb. 6, 2001)..........................................................................18

*Oxbow Calcining USA Inc.* v. *American Industrial Partners*,
948 N.Y.S.2d 24 (1st Dep't 2012) .......................................................................................6

*Portfolio Recovery Associates, LLC* v. *King*,
927 N.E.2d 1059 (N.Y. 2010)..............................................................................................6

*Schlaifer Nance & Co., Inc.* v. *Estate of Warhol*,
927 F. Supp. 650 (S.D.N.Y. 1996), *aff'd*, 119 F.3d 91 (2d Cir. 1997)................................14n

*Staehr* v. *Hartford Financial Services Group, Inc.*,
547 F.3d 406 (2d Cir. 2008)...............................................................................................2n

*Stichting Pensioenfonds ABP* v. *Credit Suisse Group AG*,
2012 WL 6929336 (N.Y. Sup. Ct. Nov. 30, 2012)............................................................7n

*Woori Bank* v. *Merrill Lynch*,
542 F. App'x 81 (2d Cir. 2013) ....................................................................................6, 14

**Statutes and Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................................1

Fed. R. Civ. P. 44.1 ..............................................................................................5n

N.Y. C.P.L.R. 202 ...............................................................................................6

N.Y. C.P.L.R. 213(8) ..........................................................................................7

## PRELIMINARY STATEMENT AND FACTUAL BACKGROUND[1]

Defendant McGraw Hill Financial, Inc. (f/k/a The McGraw-Hill Companies, Inc.) (d/b/a Standard & Poor's Ratings Services)) (referred to herein as "S&P"), respectfully submits this memorandum of law in support of its motion to dismiss the Complaint of Plaintiff IKB Deutsche Industriebank AG (referred to herein as "IKB") pursuant to Federal Rule of Civil Procedure 12(b)(6).

IKB, a German commercial bank headquartered in Düsseldorf, brings claims related to investments it made in *its own* structured investment vehicle ("SIV"), "Rhinebridge," in 2007. Specifically, IKB's allegations relate to the ratings issued by S&P (and other rating agencies) as to securities issued by a SIV that IKB itself helped arrange and, through a wholly owned subsidiary, IKB Credit Asset Management GmbH ("IKB CAM"), managed. The Rhinebridge SIV launched on June 27, 2007. Compl. ¶¶ 1, 219. IKB claims that the credit ratings S&P assigned to notes issued by the Rhinebridge SIV were false when issued in 2007.

At the simplest level, all of IKB's claims are time-barred. All of the Rhinebridge SIV's notes were downgraded to reflect the SIV's default on October 19, 2007, and the SIV entered receivership three days later. Its assets were auctioned for less than par value by its receivers in the summer of 2008. Investors in another SIV that entered receivership and had its assets auctioned at roughly the same time—the Cheyne SIV that IKB asserts served as the "roadmap" for

---

[1] The facts set forth in this Memorandum are taken from the allegations in the Complaint, which are assumed true only for purposes of this motion (and many of which will be subject to dispute if this action proceeds), from documents referred to or incorporated by reference therein, or from matters of which judicial notice may be taken. It is well settled that in considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "[b]eyond the well-pleaded allegations in the [Complaint], the Court may also consider those documents 'incorporated in the [Complaint] by reference' and 'matters of which judicial notice may be taken.'" *Dexia SA/NV* v. *Bear, Stearns & Co.*, 929 F. Supp. 2d 231, 236 (S.D.N.Y. 2013) (Rakoff, J.) (citation omitted). *See also In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (Pollack, J.).

the Rhinebridge SIV—filed suit in this Court in August 2008.  The Cheyne SIV investors sued S&P (among others) making allegations strikingly similar to those IKB makes here; Judge Scheindlin denied a motion to dismiss the fraud claims in September of 2009.[2]  A month later, in October 2009, King County, Washington (an investor in the Rhinebridge SIV), brought suit in this Court against S&P and other rating agencies—*as well as IKB itself*—for fraud in connection with the rating of the Rhinebridge SIV.[3]  IKB asserts, in papers filed in this case, that the October 2009 *King County* case "effectively is the same case" as IKB now seeks to bring here.

Yet it was not until 2014, nearly seven years after the Rhinebridge SIV collapsed, and nearly five years after IKB itself had been named as a defendant in an action based on what IKB has told this Court are "core allegations" "identical" to those now asserted against S&P, that IKB initiated this action.[4]  IKB's claims, asserted by a German entity, are subject to the three-year German statute of limitations under New York's borrowing statute, which is applicable in this diversity case. The claims are clearly time-barred because IKB had knowledge of the core factual allegations underlying its claims well before December 31, 2009, more than three years before it commenced this action.

---

[2] While declining to dismiss the fraud claims against the rating agencies, the court dismissed all ten of the other claims in that decision. *See Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009) (Scheindlin, J.).

[3] The *King County* complaint (*King County, Washington* v. *IKB Deutsche Industriebank AG, et al.*, 09-cv-8387 (SAS) (S.D.N.Y.)), is attached as Ex. 1 to the Ringel Declaration and may properly be considered on a motion to dismiss.  *See Staehr* v. *Hartford Financial Services Group*, *Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("Here, the District Court did not abuse its discretion in denying Appellants' motion to strike the materials submitted by Appellees for judicial notice purposes. The materials, like those in *Kramer*, were offered to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings, which is all that is required to trigger inquiry notice. None of those materials were offered for the truth of the matter asserted.").

[4] IKB and S&P entered a tolling agreement in May 2013, but, as discussed below, IKB's claims were already time-barred before the date of that agreement; the agreement did not purport to revive time-barred claims.

Because IKB's claims are time-barred, the Court need not consider any other basis for dismissal. But there is another fundamental flaw with IKB's theory of this case that infects its pleading. IKB cannot plausibly allege reliance, a necessary element of the fraud and negligent misrepresentation claims it asserts here.[5] IKB was no mere investor in the Rhinebridge SIV; IKB invested in a SIV that *it itself created*.[6] Indeed, as IKB acknowledges in its Complaint, the Rhinebridge SIV was intended to be the "flagship" of IKB's expansion of its asset management business. The notion that IKB was somehow duped by S&P's ratings of IKB's own SIV is facially implausible. But the problem here is even worse. As set out in the Complaint or in documents of which the Court may take judicial notice, and described in greater detail in Section II.A.2, *infra*, IKB committed to invest in the SIV's subordinated debt in order to provide a "protective capital cushion" for investors in more senior notes a year before S&P even rated the SIV's notes. Moreover, IKB was responsible for selecting all of the assets held by the SIV and for monitoring the SIV's compliance with capital adequacy (and other) tests. And S&P's ratings

---

[5] The third purported claim, for "civil conspiracy" is simply not an actionable tort under New York law.

[6] A SIV issues short-and medium term debt (including commercial paper and capital notes) to raise funds to purchase longer-term assets (*e.g.* consumer and corporate asset-backed securities ("ABS") and residential mortgage backed securities ("RMBS")). *See* Compl. ¶¶ 74-76. A SIV seeks to earn profits on the basis of the "spread between the interest rate at which it borrows and the interest rate at which it lends." Compl. ¶ 74. Rhinebridge issued debt in multiple "tranches" or levels of subordination. *See* Compl. ¶ 78. Lower tranches of debt would absorb losses first, providing "subordination—i.e. protective capital cushion" for more senior debt. *See* Compl. ¶ 209. Because of this, the more senior debt received higher ratings than the subordinated debt. *See id.* Based on the proposed asset composition, structure, capital requirements, and rules that caused the SIV to wind-down under certain predetermined circumstances, as well as other factors—including IKB's own expertise in structured finance—S&P issued ratings on certain debt issued by the Rhinebridge SIV (together the "Rhinebridge SIV Notes"). *See* Compl. ¶¶ 78, 206; Ringel Decl. Ex. 2 (S&P Presale Report) at 2-3, 6. Specifically, S&P issued a "AAA" rating for the senior notes consisting of commercial paper ("CP"), and an "A" rating to a subordinated class of notes, the mezzanine capital notes ("MCN"), but did not rate either the senior capital notes ("SCN") or the first-loss piece, the junior capital notes ("JCN"). Other rating agencies did rate the SCN. *See* Compl. ¶ 115; Ringel Decl. Ex. 2 (S&P Presale Report) at 1.

were based, in part, on IKB's representations to S&P about the expertise it would bring to the management of the vehicle (including the selection of the particular assets the vehicle would hold, a matter within IKB's sole discretion).  As the market for commercial paper evaporated in the summer of 2007 and Rhinebridge struggled to fund its obligation, IKB made additional purchases of the SIV's notes in an attempt to try to shore up the SIV and protect its own financial and reputational position—a matter of grave concern to the German authorities as public filings reflect.  IKB, the consummate "insider," cannot plausibly allege that it relied on S&P's ratings in making any of its purchases of Rhinebridge SIV notes.

As detailed below, not only did IKB wait too long to bring its lawsuit, it cannot state a claim for any of its purported causes of action.  The Complaint must therefore be dismissed.

## ARGUMENT

### I.  ALL OF IKB'S CLAIMS MUST BE DISMISSED AS UNTIMELY UNDER THE APPLICABLE THREE-YEAR GERMAN STATUTE OF LIMITATIONS

All of IKB's claims are subject to a three-year statute of limitations under German law (applicable under New York's borrowing statute as discussed *infra*).  IKB not only failed to press its claims within three years of the time it first could have done so, it failed to press its claims for nearly six years.  This is no garden-variety statute of limitations argument resting on a litany of market developments or broad statements in the press that might have put the plaintiff on notice of its potential claim.  It is *beyond dispute* that IKB learned of all the key facts it now alleges no later than 2009, when it received the *King County* complaint that was filed against both S&P and IKB itself on October 2, 2009.  *See* Ringel Decl. Ex. 1 (*King County* complaint).  Indeed, IKB was so taken with the allegations in that complaint that it copied many of them verbatim and pasted them (albeit belatedly) in the Complaint that it now seeks to pursue against S&P here.  A

comparison of the two complaints, reflecting the pervasive duplication, is included as Exhibit T to the accompanying Declaration of Jan Heiner Nedden ("Nedden Decl.").[7]

IKB seeks to bring what it itself asserts "effectively is the same case" as the case alleged against S&P in the *King County* complaint based on "identical" "core allegations." *See* IKB's Related Case Statement, 14-cv-3443 (S.D.N.Y. May 12, 2014) Dkt. No. 3. But IKB has slept on its rights for too long.[8] Because IKB had knowledge of the core factual allegations underlying its claims here well before December 31, 2009, all of its claims must be dismissed as untimely under the applicable three-year German statute of limitations. This case provides the paradigmatic example of a situation in which a claim should be dismissed on statute of limitations grounds.[9]

---

[7] The Nedden expert declaration addresses the content of the German law relevant to this motion. Pursuant to Federal Rule of Civil Procedure 44.1, S&P hereby gives notice of its intent to raise an issue of German law. Fed. R. Civ. P. 44.1 provides that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Id.*; *see also CIH International Holdings, LLC* v. *BT United States, LLC*, 821 F. Supp. 2d 604, 608 n.1 (S.D.N.Y. 2011) (Crotty, J.) ("CIH has submitted to the Court the declaration of Tércio Chiavassa, a Brazilian tax lawyer. The Court may take judicial notice of the information provided in this declaration and consider it on a motion to dismiss."). In determining foreign law, the court "may decide between conflicting expert affidavits and it may do so at the motion to dismiss stage even when the expert affidavits submitted by the parties disagree." *Deutsche Zentral-Genossenchaftsbank AG* v. *HSBC North America Holdings, Inc.*, 2013 WL 6667601, at *7 (S.D.N.Y. Dec. 17, 2013) (Torres, J.).

[8] IKB began filing actions asserting tort claims in connection with alleged losses on its investments in RMBS **in 2011**, but waited to file **this** action until 2014. *See, e.g.*, *IKB Deutsche Industriebank AG* v. *Credit Suisse Securities (USA) LLC, et al.* (Index No. 653122/2011) (N.Y. Sup. Ct.); *IKB International S.A. In Liquidation* v. *JPMorgan Chase & Co., et al.* (12-cv-4617) (S.D.N.Y.); *IKB International S.A. In Liquidation* v. *Bank of America Corp., et al.* (12-cv-6151) (C.D. Cal).

[9] "A statute of limitations protects defendants by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared" and "protects the courts by relieving the burden of trying stale claims when a plaintiff has slept on his rights." *Ferrera* v. *Fisher*, 2014 WL 1303436, at *4 (S.D.N.Y. Apr. 1, 2014) (Engelmayer, J.) (citations and internal quotation marks omitted).

A.      **Germany's Three-Year Statute of Limitations Applies to IKB's Claims**

Plaintiff's claims are explicitly premised on diversity jurisdiction.  *See* Compl. ¶ 71. "It is well settled that a federal court sitting in diversity must look to the law of the forum state to determine which state's statute of limitations to apply." *Woori Bank* v. *Merrill Lynch*, 542 F. App'x 81, 82 (2d Cir. 2013).  In order to "prevent forum shopping by nonresidents attempting to take advantage of a more favorable statute of limitations in this state," New York's borrowing statute requires non-resident plaintiffs to file their claims within the *shorter* of: (a) the New York statute of limitations or (b) the statute of limitations in the jurisdiction in which the claim accrued.  *See, e.g.*, *Portfolio Recovery Associates, LLC* v. *King*, 927 N.E.2d 1059, 1062 (N.Y. 2010); *Antone* v. *General Motors Corp., Buick Motor Division*, 473 N.E.2d 742, 746 (N.Y. 1984); N.Y. C.P.L.R. 202.  "[A] cause of action accrues," for these purposes, "at the time and in the place of the injury." *See Global Financial Corp.* v. *Triarc Corp.*, 715 N.E.2d 482, 485 (N.Y. 1999).  "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Id.*  A corporation resides in either its principal place of business or place of incorporation.  *See, e.g.*, *id.* (where "plaintiff's causes of action are time-barred whether one looks to its State of incorporation or its principal place of business" the court need not determine where "plaintiff more acutely sustained the impact of its loss"); *Oxbow Calcining USA Inc.* v. *American Industrial Partners*, 948 N.Y.S.2d 24, 30 (1st Dep't 2012).

IKB itself alleges that it is both incorporated and has its principal place of business in Germany.  *See* Compl. ¶ 61 ("Plaintiff IKB Deutsche Industriebank AG ("IKB" or "Plaintiff") is a commercial bank incorporated in Germany, with a main office at Wilhelm-Botzkes-Strasse 1, 40474 Düsseldorf, Germany."). Thus, its alleged causes of action accrued in Germany where it resides and where it suffered its alleged losses. *See, e.g.*, *Global Financial Corp.*, 715 N.E.2d at

485; *Deutsche Zentral-Genossenschaftsbank AG, New York Branch* v. *UBS AG*, 2014 WL 1495632, at *1 (N.Y. Sup. Ct. Apr. 17, 2014) (applying German statute of limitations where "the place of injury is Germany, where DZ bank is incorporated and the economic impact of the loss was sustained"), *amended on other grounds* 652575/2012 (N.Y. Sup. Ct. Apr. 23, 2014) Dkt. No. 95.

The German statute of limitations for the fraud and negligent misrepresentation claims asserted by IKB here is three years.  *See* Nedden Decl. Ex. D (German Civil Code Section 195); Nedden Decl. ¶ 20.[10]  Because Germany's three-year statute of limitations is shorter than New York's six-year statute of limitations for fraud (*see* N.Y. C.P.L.R. 213(8)) and negligent misrepresentation,[11] the German statute of limitations applies under the borrowing statute.

The three-year German statute of limitations runs from the end of the calendar year in which (1) the claim has arisen and (2) the plaintiff either (a) has actual knowledge of the circumstances giving rise to the claim and the identity of the defendant; or (b) would have had such knowledge but for gross negligence.  *See* Nedden Decl. Ex. D (German Civil Code Section 199(1)); Nedden Decl. ¶ 21.  The claim arises for purposes of the first portion of this inquiry when the "claim could have been brought by the plaintiff" based on the "objective existence of

---

[10] As discussed in Section II.B, *infra*, New York does not recognize a separate cause of action for "civil conspiracy."  However, were such an action to exist, it also would be subject to the three year statute of limitations under German law.  *See* Nedden Decl. ¶¶ 15, 20.

[11] This assumes, *arguendo*, that the Court would apply a six-year statute of limitations to IKB's negligent misrepresentation claim here under New York law.  *See, e.g.*, *Stichting Pensioenfonds ABP* v. *Credit Suisse Group AG*, 2012 WL 6929336, at *14 (N.Y. Sup. Ct. Nov. 30, 2012) (noting that courts may apply the six-year statute of limitations to negligence claims "pled in conjunction with a fraud claim" or "sound[ing] in fraud," rather than the ordinary three-year statute of limitations for such claims, and that the "cases on point are difficult to reconcile.").  Were the Court to instead apply the three-year New York statute of limitations, the negligent misrepresentation claim would be time-barred in any event because it was not filed within three years of the time it accrued under New York law.

facts giving rise to the claim, not their public availability or a plaintiff's actual or imputable knowledge of them." Nedden Decl. ¶ 22. The second portion of the inquiry asks when the plaintiff had "knowledge of the circumstances giving rise to the claim and of the identity of the defendant." *See* Nedden Decl. ¶ 23. Because IKB had knowledge of the core factual allegations underlying its claims here well before December 31, 2009, its claims are time-barred because IKB failed to bring them before the resulting December 31, 2012 deadline.

**B.      IKB's Claims in This Action Arose in 2007 and Certainly No Later than 2008**

Based on IKB's own allegations, the claims it asserts here arose in 2007 and certainly no later than 2008. The claim arises for purposes of the inquiry under German law as soon as all of the elements of the claim have occurred. *See* Nedden Decl. ¶¶ 22, 41. IKB alleges that: (i) S&P knowingly made materially false and misleading representations and omissions in 2007 (Compl. ¶¶ 120, 125, 218); (ii) S&P, in making those statements in 2007, failed to exercise its asserted duty to give correct information (Compl. ¶ 265); (iii) IKB relied on the misrepresentations or omissions in investing in Rhinebridge Notes in 2007 (Compl. ¶¶ 115, 219-20, 227-30, 234-35); and (iv) the alleged misrepresentations caused IKB damages when the SIV collapsed in 2007, or no later than 2008 when IKB accepted less than the full value of its investments in connection with the receivership of the Rhinebridge SIV (Compl. ¶¶ 42, 236-239, 287). Accordingly, all of the elements of IKB's claims occurred, and its claims arose under German law, in 2007 (and certainly no later than 2008). *See* Nedden Decl. ¶ 40.

**C.      IKB Had Actual Knowledge of the Facts Underlying its Claims Against S&P Well Before December 31, 2009**

Broadly speaking, the German statute of limitations looks to what facts the plaintiff knew and when it knew them in determining whether and when plaintiff had "knowledge" of sufficient facts on which to assert a claim. The Rhinebridge SIV defaulted on Senior Notes payments on

October 18, 2007.  Compl. ¶ 237.  The next day, October 19, 2007, S&P downgraded the Rhinebridge SIV's Notes to default status.  *See* Compl. ¶ 120.  The Cheyne SIV, another structured investment vehicle which served as the "roadmap for Rhinebridge" (Compl. ¶ 7), failed around the same time.  *See Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 168 (S.D.N.Y. Sept. 2, 2009).  By October 22, 2007, the Rhinebridge SIV was in receivership, and the two vehicles' assets were auctioned off on July 23, 2008 and July 31, 2008 respectively.  *See* Compl. ¶ 237-38; Nedden Decl. Ex. C-6 (July 23, 2008 SIV Portfolio PLC Notice on the Irish Stock Exchange) and Nedden Decl. Ex. C-7 (July 31, 2008 Rhinebridge PLC Notice on the Irish Stock Exchange).  The announcements made clear that the proceeds would be insufficient to pay the senior noteholders in full and, as such, would be insufficient to allow any repayments to subordinated debt holders.  *Id.*  (IKB asserts claims as to both senior and subordinated notes here.)

Less than a month later, on August 25, 2008, investors in the Cheyne SIV brought an action in the U.S. District Court for the Southern District of New York against S&P, Moody's, Morgan Stanley and others alleging that the defendants had committed fraud in connection with the structuring and rating of the Cheyne SIV.  *See* Complaint, *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 08-cv-7508 (S.D.N.Y. Aug. 25, 2008) Dkt. No. 1.  On September 2, 2009, this Court (Scheindlin, J.), while dismissing ten claims against the Rating Agencies, upheld the *Abu Dhabi* complaint against a motion to dismiss, ruling that plaintiffs had adequately alleged fraud claims against the rating agencies (including S&P) and Morgan Stanley (the arranger of the Cheyne SIV).  *See Abu Dhabi*, 651 F. Supp. 2d at 188.

On October 2, 2009, within weeks of the *Abu Dhabi* decision, King County, Washington, a Rhinebridge SIV investor, filed a complaint against IKB, IKB's Winfried Reinke (the IKB AG

employee who had been CEO of IKB CAM), Stefan Ortseifen (who had been CEO of IKB AG), S&P, Moody's, and Fitch.  King County made allegations of fraud in connection with the rating of the Rhinebridge SIV by S&P, Moody's and Fitch similar to those made in the *Abu Dhabi* litigation.  *See* Ringel Decl. Ex. 1 (*King County* complaint).

IKB did not file suit against S&P at that time.  Nor did IKB assert any cross-claim against S&P, its co-defendant in the *King County* action.  IKB settled with the *King County* plaintiffs in May of 2012.  Order of Discontinuance, *King County, Washington* v. *IKB Deutsche Industriebank AG, et al,* 09-cv-8387 (S.D.N.Y.) Dkt. No. 261.  Four years after the *King County* complaint was filed, in April of 2013, S&P entered into settlement agreements with the plaintiffs in the *Abu Dhabi* and *King County* actions and both actions were voluntarily dismissed by stipulation on April 26, 2013.  *See* Stipulation of Voluntary Dismissal with Prejudice, *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 08-cv-7508 (S.D.N.Y.) Dkt. No. 620; Stipulation of Voluntary Dismissal with Prejudice, *King County, Washington* v. *IKB Deutsche Industriebank AG, et al.*, 09-cv-8387 (S.D.N.Y.) Dkt. No. 365.  Almost immediately after that settlement, IKB approached S&P, asking that S&P enter into a tolling agreement with IKB related to potential claims as to Rhinebridge.  S&P and IKB did enter into such a tolling agreement on May 10, 2013, and, when it expired in May of 2014, IKB filed the instant action.

But IKB's claims here were time-barred before S&P and IKB ever entered into the tolling agreement (and were not revived by that agreement).  IKB had actual knowledge of the factual allegations giving rise to its claims and the identity of the defendant well before December 31, 2009.  As such, and as explained in detail in the accompanying declaration of Mr. Nedden, the time for IKB to bring the instant action expired on December 31, 2012 and its Complaint filed on

May 12, 2014 is untimely (and would have been untimely at the time the tolling agreement became effective, May 10, 2013).[12]

IKB does not and could not dispute that it had actual knowledge of the *King County* complaint in 2009 due to its posture as a defendant in that action. *See* IKB's Waiver of Service, *King County, Washington* v. *IKB Deutsche Industriebank AG*, 09-cv-8387 Dkt. No. 31.[13]  IKB affirmatively asserts that this action "effectively is the same case" as *King County* and "clearly concerns the same parties, transactions and events at issue in *King County*;" that "[t]he core allegations in both cases are identical—i.e., that the rating agencies issued false and misleading credit ratings to the notes issued by Rhinebridge;" and that "[a]t the heart of each case are substantially identical factual and legal issues concerning the fraudulent credit ratings McGraw Hill assigned to notes issued by the Rhinebridge SIV—and the claim in both cases is that McGraw Hill issued such ratings knowing they were unsupported by facts or analysis." *See* IKB's Related Case Statement, 14-cv-3443 (S.D.N.Y. May 12, 2014) Dkt. No. 3; IKB's Reply on Related Case Statement, 14-cv-3443 (S.D.N.Y. May 19, 2014) Dkt. No. 7.

---

[12] IKB's claim would be time-barred even absent the actual knowledge described in text.  As the Nedden Declaration observes, "even assuming, hypothetically, that Plaintiff had no actual knowledge of the circumstances giving rise to its asserted claims, it could have obtained such knowledge but for gross negligence well before the end of 2009."  Nedden Decl. ¶¶ 45-50.  As explained in the Nedden declaration, IKB had particular and specific reason to investigate the risks to which it was exposed (including any risks relating to the Rhinebridge SIV) due to (i) the legal obligation German corporations have to their shareholders to investigate risks to the corporation with due diligence and (ii) the numerous inquiries, investigations and audits of which IKB itself was the subject between 2007 and 2009 regarding its exposure to subprime securities and misstatements and misjudgments allegedly made by its officers and supervising and managing boards.  *See id.* ¶¶ 48-49.

[13] *See also* Nedden Decl. ¶ 35(d) ("IKB reported to its investors in its publicly filed Annual Report 2009/2010 that it learned of the King County Complaint at the time it was filed in early October 2009").  The *Abu Dhabi* decision also was publicized in the German press.  *See* Nedden Decl. ¶ 36(d).

The factual allegations IKB has lifted from the 2009 *King County* complaint relate to, among other things, the alleged scienter and purported knowledge of falsity of S&P (the specific defendant in this action) as to the Rhinebridge SIV Notes (the specific securities at issue in this action).[14]   The complaint in *King County*, for instance, alleged that S&P had a "powerful economic incentive[] to provide false ratings" because: (i) S&P was allegedly paid fees "three times higher than the Rating Agencies' compensation for rating traditional municipal or corporate bonds" to rate the Rhinebridge SIV; (ii) S&P was paid this fee only if it provided the ratings desired by the issuer; and (iii) S&P's fees were paid from the proceeds of selling Rhinebridge Notes which would sell successfully only if the notes were highly rated.  *See* Ringel Decl. Ex. 1 (*King County* complaint) ¶¶ 29, 58, 60.[15]   Though these statements are inaccurate, IKB makes the same allegations in its Complaint here.  *See* Compl. ¶¶ 64, 95-97.

---

[14] The substantial degree of duplication between the complaint filed in *King County* on October 2, 2009, and the Complaint filed by IKB in this action on May 12, 2014 is depicted in detail in the chart attached at Exhibit T to Mr. Nedden's Declaration.  The chart demonstrates the extent to which the present Complaint repeats, essentially verbatim, very specific factual allegations leveled against the Rating Agencies in the *King County* complaint.  Where the allegations from *King County* would hurt IKB's present position, IKB simply struck the inconvenient text.  For example, in the present Complaint IKB alleges that the Rating Agencies "had to monitor Rhinebridge's capital frequently," while omitting the *King County* allegation directly following: "**IKB** was supposed to run tests every day to determine whether the amount of capital held by Rhinebridge was consistent with the Top Ratings requirements, and to calculate various capital tests for the Rating Agencies every week." (emphasis added) *Compare* Compl. ¶ 92 *with* Ringel Decl. Ex. 1 (*King County* complaint) ¶ 54. *Compare also* Compl. ¶ 84 *with* Ringel Decl. Ex. 1 (*King County* complaint) ¶ 45 (removing reference to IKB's role in creating Rhinebridge).

[15] Similar allegations regarding S&P's alleged motive to issue false ratings on the Cheyne SIV (*see Abu Dhabi* First Amended Complaint ¶¶ 7, 22, 58) figured prominently in Judge Scheindlin's 2009 holding that plaintiffs had adequately pleaded scienter as to the Rating Agencies in *Abu Dhabi*: "Effectively, 'the Rating Agencies were paid only if they provided the desired ratings and only in the event that the transaction closed with those ratings.'  This may be sufficient to support a finding of motive."  *See Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 179 (S.D.N.Y. Sept. 2, 2009); First Amended Complaint, *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 08-cv-7508 (S.D.N.Y. Mar. 31, 2009) Dkt. No. 34.

Further, IKB's present Complaint, in attempting to demonstrate that S&P knew that the ratings on the Rhinebridge SIV were false, includes quotations from a number of documents of S&P employees or former employees, material clearly publicly available in 2009 and offered in the *King County* complaint. For example, IKB cites an instant message, not alleged to relate to Rhinebridge, to the effect that a deal "could be structured by cows and [S&P] would rate it" (IKB Compl. ¶¶ 39, 43, 146; Ringel Decl. Ex. 1 (*King County* complaint) ¶ 100) and a Bloomberg article published in 2008 attributing to a former S&P Managing Director the statement that "[S&P] thought they had discovered a machine for making money that would spread the risks so far that nobody would ever get hurt" (IKB Compl. ¶ 143, 146; Ringel Decl. Ex. 1 (*King County* complaint) ¶ 95).[16]

It is clear then that in 2009, IKB had actual knowledge of sufficient facts upon which to assert a claim against the specific defendant it now targets. *See* Nedden Decl. ¶¶ 24, 44.[17] IKB did not need to "know[] all details that may possibly be significant." *Id.* ¶ 44; *see also id.* ¶ 26 ("The discovery of new facts or evidence regarding the same ultimate claim does not restart the statute of limitations."). Nor is "[a]n accurate assessment of the lawfulness of the course of events" by IKB necessary. *See* Nedden Decl. ¶ 25.

---

[16] Similar allegations appeared in the First Amended Complaint in *Abu Dhabi*. *See* First Amended Complaint, *Abu Dhabi*, 08-cv-7508 Dkt. No. 34, ¶¶ 129, 124. These allegations (among others) were cited by Judge Scheindlin in stating, in her 2009 denial of defendants' motion to dismiss in *Abu Dhabi*, that "former employees of the Rating Agencies, former SEC chairmen, and a Congressional Representative, ha[d] stated publicly that the Rating Agencies and industry insiders like Morgan Stanley knew at the time the Cheyne SIV's ratings were issued that the process used to derive ratings generally was deeply flawed and unreliable." *See Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 178 & n.146 (S.D.N.Y. Sept. 2, 2009).

[17] "This is particularly true given that investors in Cheyne, the SIV which served as the 'roadmap' for Rhinebridge (Complaint ¶ 7), already had succeeded in surviving a motion to dismiss based on very similar allegations in September of 2009." Nedden Decl. ¶ 44.

Because IKB had actual knowledge of the facts underlying its claims here well before December 31, 2009, IKB's Complaint would only be timely under the German statute of limitations if filed by December 31, 2012.  It was not.  IKB's Complaint in this action must be dismissed as time-barred under the applicable foreign statute of limitations.  *See, e.g.*, *Woori*, 542 F. App'x at 81-82 (affirming dismissal of complaint under Rule 12(b)(6) as time barred for failure to satisfy the South Korean statute of limitations).

## II.   IKB DOES NOT AND CANNOT STATE A CLAIM FOR ANY OF ITS PURPORTED CAUSES OF ACTION

Without conceding the validity or sufficiency of any of IKB's allegations, we focus in this motion to dismiss on the fundamental flaws that doom the reliance element of IKB's fraud and negligent misrepresentation claims.[18]

### A.   IKB Does Not and Cannot Plead the Reliance Element of Its Fraud and Negligent Misrepresentation Claims

#### 1.   IKB's Insider Role as Manager and Sponsor of the Rhinebridge SIV Bars its Allegations of Reliance

IKB brings claims for fraud, negligent misrepresentation, and civil conspiracy against S&P based on S&P's ratings of a transaction in which IKB itself was the consummate insider as "sponsor" and, through its wholly owned subsidiary, IKB CAM, as manager of Rhinebridge.[19]

---

[18] Under New York law, plaintiffs alleging common law fraud must demonstrate actual and reasonable reliance.  *See, e.g.*, *Schlaifer Nance & Co., Inc.* v. *Estate of Warhol*, 927 F. Supp. 650, 660 (S.D.N.Y. 1996) (Chin, J.), *aff'd*, 119 F.3d 91 (2d Cir. 1997); *see also In re Marsh & Mclennan Cos., Inc. Securities Litig.*, 501 F. Supp. 2d 452, 495 (S.D.N.Y. 2006) (Kram, J.); *Hydro Investors, Inc.* v. *Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000) (plaintiff asserting a claim for negligent misrepresentation must allege that the "plaintiff intended to rely and act" upon the misrepresentation and that "the plaintiff reasonably relied on [the misrepresentation] to his or her detriment").

[19] IKB's integral role in the Rhinebridge SIV made headlines in the German press beginning in 2007.  *See, e.g.*, Werner Sturbeck and Joachim Jahn, "IKB's Special-Purpose Vehicle Rhinebridge is Being Liquidated," Frankfurter Allgemeine Zeitung, Oct. 19, 2007; Nicole Bastian, "Defaults Scare Investors—IKB Special Purpose Vehicle Rhinebridge Cannot Service Debt

In New York, "there can be no liability in fraud where the complaining party is, in advance, fully knowledgeable [about] and apprised of those matters as to which the representations are alleged to have deceived." *200 East End Avenue Corp.* v. *General Electric Co.*, 172 N.Y.S.2d 409, 412 (1st Dep't 1958), *aff'd* 6 N.Y.2d 731 (1959); *see also Buechner* v. *Avery*, 836 N.Y.S.2d 1, 2 (1st Dep't 2007) (dismissing shareholder plaintiffs' claims for failure to plead reasonable reliance because of the shareholders' "knowledge, access to information and participation in the subject transactions").

Here, the *Complaint* concedes that IKB was an insider to the subject transactions as the SIV's manager and sponsor.  *See* Compl. ¶¶ 54, 69, 208 (discussing IKB CAM's role as the SIV "manager" and IKB AG's role as a SIV "sponsor").[20]  In fact, as IKB effectively concedes in the Complaint, and as is made clear in a document the Complaint incorporates, in issuing the SIV ratings S&P actually relied on the "protective capital cushion" provided by IKB.[21]  In this scenario, IKB cannot plausibly claim to have relied on S&P's SIV ratings in purchasing the Rhinebridge Notes.  Although the Complaint tries to allege that IKB relied on S&P in making its Rhinebridge SIV investment decisions, it cannot, as an insider, plead facts sufficient to show that it was anything but fully knowledgeable about the core subject of the alleged fraud—the SIV's

---

and is Forced to Undergo Liquidation," Handelsblatt, Oct. 22, 2007, at no. 203; "IKB's Bridge to Nowhere—Rhinebridge," Financial Times Deutschland, Dec. 8, 2009 (attached as Exhibit B to the Nedden Declaration).

[20] IKB's counsel recently asserted that Plaintiff was not "situated any different at all than any different noteholder in the prior case."  *See* Hearing Transcript at 12:14-16, *IKB Deutsche Industriebank AG* v. *McGraw Hill Financial, Inc.*, 14-cv-3443 (May 29, 2014) Dkt. No. 16.  But this is simply not accurate as the references in text to IKB's status as "sponsor" and "manager" with respect to Rhinebridge make clear.

[21] *See* Compl. ¶ 209 ("[I]t was in large measure IKB's investment in these Capital Notes that provided the subordination – i.e., protective capital cushion – for the higher rated notes that were essential to the SIV's launch"); *see also* Ringel Decl. Ex. 2 (S&P Presale Report) at 6 (noting that IKB's "strong experience as an investment manager" helped give S&P comfort with the Rhinebridge SIV's ability to invest in up to 75% RMBS assets).

creditworthiness.  *See Jimenez* v. *Brazil Ethanol, Inc.*, 2012 WL 696396, at *1 (S.D.N.Y. Feb. 29, 2012) (Sand, J.) ("Put differently, we found that if, as a self-professed insider, [Plaintiff] contends that he was aware of the prospectus, then it was incumbent upon him as an insider to provide enough facts to make it plausible to infer that he was unaware of the alleged fraud.  We found that [Plaintiff] had failed to do so.").

This insider status provides a complete refutation of any claim of reliance and hence bars both the fraud and negligent misrepresentation claims.  Below, we focus on the Complaint's separate failure to demonstrate actual, let alone reasonable, reliance as to *any* of IKB's alleged Rhinebridge Note purchases in June and August 2007, the only purchases at issue.  This provides a complete and separate basis for dismissal.

### 2.      The Complaint Fails to State Facts Giving Rise to Actual or Reasonable Reliance as to Any of the Alleged Rhinebridge Note Purchases

#### a.  *IKB Could Not have Actually Relied on S&P's Ratings in its Purchases of Junior Capital Notes or Senior Capital Notes Because S&P Never Rated those Notes*

To survive a motion to dismiss, IKB was required to allege, as to each of the categories of notes it actually purchased, including Commercial Paper, Senior Capital Notes ("SCN"), Mezzanine Capital Notes ("MCN"), and Junior Capital Notes ("JCN"), reliance on S&P's ratings.  It has failed to do so.

First, IKB faces an indisputable and insurmountable threshold problem in claiming reliance as to two categories of notes: Junior Capital Notes and Senior Capital Notes.  IKB cannot adequately allege reliance on S&P's Rhinebridge ratings in purchasing Junior Capital Notes or Senior Capital Notes [22] because **S&P never rated these notes**, as the Complaint itself concedes.

---

[22] Plaintiff allegedly acquired $12 million in Junior Capital Notes and $60 million in Senior Capital notes on June 27, 2007, and another $110 million in Rhinebridge Junior Capital Notes in early August 2007.  *See* Compl. ¶¶ 220, 230.

*See* Compl. ¶ 115; *see also* Ringel Decl. Ex. 2 (S&P Presale Report) at 1.  The fact of S&P's non-rating of those notes is dispositive.  Judge Scheindlin confronted precisely this issue in the *Abu Dhabi* case and dismissed claims based on unrated SIV notes.  *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 466 (S.D.N.Y. 2012) ("S&P cannot be liable for [plaintiff's] losses stemming from the performance of [notes] which S&P did not rate.").  The same conclusion follows here.  As a result, IKB's fraud claim as to its investment in the JCNs and SCNs must be dismissed.

> **b.  *As a Matter of Law, IKB Cannot Demonstrate Reliance on S&P's Ratings of Mezzanine Capital Notes Because IKB Committed to Buy Those Notes Long Before S&P Rated Them***

Likewise, IKB's claim that it "relied" on S&P's "A" Mezzanine Capital Notes rating when it purchased $77 million of MCNs in June 2007 falls flat because IKB contractually committed to purchase such notes long before any S&P rating of the notes was issued.  *See* Compl. ¶ 207.  New York courts have repeatedly held that "one cannot be induced to sign a contract by representations made after the contract has already been executed."  *O'Dell* v. *Ginsberg*, 677 N.Y.S.2d 544, 544 (2nd Dep't 1998); *Jimenez*, 2012 WL 696396, at *1 ("Based on the principle that 'it is impossible to establish reliance . . . on statements which were issued after the purchase of stock,' we found that [Plaintiff] had not adequately pled reliance and that this was fatal to his Rule 10b–5 claim.") (internal citation omitted)); *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) ("Only one of the plaintiffs . . . asserts that it received [the alleged misstatement]. But [Plaintiff] cannot show any reliance on this statement because it had already made its one and only investment . . . six weeks earlier.").

On June 21, 2006, IKB and non-party Morgan Stanley entered into an engagement letter to create a SIV as "part of IKB's efforts to expand its existing investment advisory and asset management business." Compl. ¶¶ 211, 207; Ringel Decl. Ex. 4 (Morgan Stanley engagement

letter).[23]   As IKB alleges in the Complaint, in that 2006 letter, IKB contractually committed to purchase a *minimum* of 40% of the JCN and 25% of the MCN of Rhinebridge long before S&P issued any rating as to Rhinebridge notes.  *See* Compl. ¶ 207.  Indeed, IKB emphasizes that the rating agencies were aware of that engagement letter and this commitment by IKB *before* they rated Rhinebridge.  Compl. ¶¶ 207-08.  IKB cannot plead actual reliance on S&P ratings that had yet to be issued when IKB committed to purchase those MCNs.[24]   Accordingly, the engagement letter, prominently discussed in the Complaint, refutes any notion of actual reliance on S&P's Rhinebridge MCN ratings when IKB purchased these notes in June 2007.  *See Olshansky* v. *Sutton*, 2001 WL 99857, at *3 (S.D.N.Y. Feb. 6, 2001) (Preska, J.) (dismissing fraud claim because court was "unable to infer" actual reliance from the pleadings).

### c. *The Complaint Fails to Plead Sufficient Facts to Show Actual or Reasonable Reliance on S&P's Ratings of Commercial Paper*

As to the alleged reliance on S&P's Commercial Paper rating, facts in the Complaint completely refute IKB's conclusory assertion of reliance in making its August 15 and 31, 2007 purchases.  *See* Compl. ¶¶ 234, 235.  Specifically, the Complaint alleges that the July 10, 2007 S&P ratings actions with respect to various residential mortgage-backed securities ("RMBS"), though not among those held by Rhinebridge, "created confusion throughout the asset-backed securities markets" and "market prices for assets comprised of subprime mortgage loans entered a phase of great volatility."  Compl. ¶¶ 225, 226.  As a result, according to the Complaint, "price

---

[23] In 2002, IKB had launched an asset-backed commercial paper conduit called Rhineland Funding Capital Corp and managed that vehicle until "advisory services" were transferred to IKB CAM (Compl. ¶¶ 56 n.2, 211), a wholly owned subsidiary of IKB created in December 2006 to take over IKB's "asset management business."  Compl. ¶¶ 55, 68.  IKB CAM would serve as the manager of the Rhinebridge SIV, which was to serve as the "flagship vehicle in IKB CAM's expansion into asset-backed securities asset management."  Compl. ¶ 68, 211.

[24] In the Complaint, Plaintiff alleges that "[t]he false ratings were communicated to IKB and others starting on or about June 27, 2007, when the Rhinebridge Notes were first sold to investors."  *See* Compl. ¶ 120.

pressure began to effect Rhinebridge" and the "key question for IKB at this time was whether Rhinebridge continued to be viable long term and, if so, how best to see it through this period." *See* Compl. ¶¶ 226, 227.

The Complaint itself alleges that IKB decided to invest additional capital into the Rhinebridge SIV *to stabilize the SIV*. *See* Compl. ¶ 230 ("IKB purchased another $110 million of Rhinebridge Junior Capital Notes *in order to provide further liquidity and capital support to the vehicle*.") (emphasis added); Compl. ¶ 235 ("[I]n *an attempt to mitigate any damage* to its investment advisory/asset management business, IKB made a final investment of $20 million in Rhinebridge commercial paper, on August 31, 2007.") (emphasis added).  IKB's general allegations of reliance on the CP rating in the Complaint thus are contradicted by the more specific allegations regarding IKB's real reason for purchasing Rhinebridge SIV Notes in August 2007:  a desire to stabilize the SIV and protect its own interests.  The Court "need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."  *In re Livent Inc. Noteholders Securities Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (Marrero, J.).  IKB's conclusory and implausible assertion of actual reliance is belied by IKB's own fact allegations in the Complaint.  IKB has thus failed to allege adequately *actual reliance* as to its August 2007 CP purchases.

Moreover, the allegations in the Complaint also render any alleged reliance by IKB on S&P's CP ratings in August 2007 *unreasonable* as a matter of law.  IKB "could not have reasonably relied on information [it] knew to be false."  *Knox* v. *Countrywide Bank*, 2014 WL 946635, at *3 (E.D.N.Y. Mar. 12, 2014) (citation omitted) (dismissing fraud claim on a motion to dismiss

in part because plaintiffs "could not reasonably have relied on [information] that they knew to be false (as conceded in the complaint)"); *see also Banque Franco-Hellenique de Commerce International et Maritime, S.A.* v. *Christophides*, 106 F.3d 22, 27 (2d Cir. 1997) ("[Plaintiff] could not have justifiably relied on statements that he had reason to know were false.").

According to the Complaint, the "credit ratings were false and misleading because they misstated the likelihood that Rhinebridge would collapse." *See* Compl. ¶ 43.  But the Complaint also alleges that IKB was acutely aware in August 2007 that significant credit issues confronted the SIV.  *See* Compl. ¶¶ 226, 227, 235.  Indeed, IKB recognized that there was a question as to "whether Rhinebridge continued to be viable long term," as one would expect given IKB's unique perspective on what was actually happening with Rhinebridge during this tumultuous period.  *See* Compl. ¶ 227.

IKB CAM, as the party responsible for monitoring the SIV's compliance with various investment parameter and capital adequacy tests would have known at all times exactly how close the Rhinebridge SIV was to breaching any test.  *See* Compl. ¶ 204; Ringel Decl. Ex. 3 (Rhinebridge Private Placement Memorandum ("PPM"))[25] at 70-73.  In order to ensure that the Rhinebridge SIV could maintain its ratings, IKB CAM was required to monitor the SIV's compliance with specific operating rules and parameters as set out in the legal documents governing the SIV.  *See, e.g.*, Ringel Decl. Ex. 3 (PPM) at 60 (discussing various tests).  The breach of certain tests (*e.g.* the major capital loss test) would require deferral of any payments to capital noteholders until the senior noteholders were repaid in full.  In this restricted operating mode, the vehicle might be required to sell assets in an effort to repay maturing senior debt.  *See* Ringel Decl. Ex. 2 (S&P Presale Report) at 6-10.  IKB was to receive the results of these tests directly and

---

[25] The private placement memorandum is cited in the Complaint (*see, e.g.*, Compl. ¶ 95, 110), and hence may properly be considered on this motion.  *See Dexia SA/NV*, 929 F. Supp. 2d at 236.

thus was acutely aware of the peril that it claims S&P hid from it.  *See* Ringel Decl. Ex. 3 (PPM) at 38.  And since it was IKB CAM's responsibility to "notify the Rating Agencies of any breach of the investment parameter test" (Compl. ¶ 204), IKB CAM should have become aware of any test breach *before* the Rating Agencies.  Accordingly, IKB could not, by its own admissions, have been misled by the allegedly false CP credit ratings when it purchased Rhinebridge notes in August 2007 because it knew then that the SIV was financially distressed.

**B.**     **IKB Fails to State a Claim With Respect to its Allegations of a "Civil Conspiracy"**

IKB also attempts to repackage its fraud claim as a free-standing count of "civil conspiracy." (Compl. ¶¶ 280-288.)  "It is a well-settled and often repeated principle of New York law that no cause of action lies for civil conspiracy."  *Aetna Casualty & Surety Co.* v. *Aniero Concrete Co.*, 404 F.3d 566, 591 (2d Cir. 2005); *see also Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) ("New York does not recognize an independent tort of conspiracy."). IKB's independent count for civil conspiracy must therefore be dismissed.

## CONCLUSION

S&P respectfully submits that the Complaint should be dismissed with prejudice.


Dated:  New York, New York
          June 20, 2014

By:   /s/ Dean Ringel

Floyd Abrams  (FAbrams@cahill.com)
Dean Ringel  (DRingel@Cahill.com)
Jason M. Hall  (JHall@Cahill.com)
Roxana Labatt (RLabatt@Cahill.com)
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005-1702
Phone: (212) 701-3000
Fax: (212) 269-5420

*Attorneys for Defendant*
*McGraw Hill Financial, Inc.*

-21-