**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IKB DEUTSCHE INDUSTRIEBANK AG,

                 Plaintiff,

       vs.

McGRAW HILL FINANCIAL, INC. (f/k/a THE
McGRAW-HILL COMPANIES, INC. (d/b/a
STANDARD & POOR'S RATINGS SERVICES)) and
STANDARD & POOR'S FINANCIAL SERVICES LLC,

                Defendants.

No. 14 Civ. 3443 (JSR)

---

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Attorneys for Plaintiff*
*IKB Deutsche Industriebank AG*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................ii-v

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT ...........................................................................................................3

  I.   THE LEGAL STANDARD .............................................................................3

  II.  IKB'S CLAIMS ARE TIMELY ....................................................................4

          A.   The Standard for Triggering the German Statute of Limitations Is Rigorous, Fact-Intensive, and Almost Never Subject to Resolution on a Motion to Dismiss ...............................................................5

          B.   IKB's Claims Are Not Barred by the German Statute of Limitations ...............7

  III.  THE AMENDED COMPLAINT STATES CLAIMS FOR COMMON LAW FRAUD AND NEGLIGENT MISREPRESENTATION ................................................15

          A.   IKB Was Not an "Insider" to S&P's Fraud .....................................17

          B.   The Amended Complaint Alleges Actual and Reasonable Reliance on S&P Ratings In Connection with Each IKB Purchase of Rhinebridge Notes .........19

  IV.  THE AMENDED COMPLAINT STATES A CLAIM FOR CIVIL CONSPIRACY TO COMMIT COMMON LAW FRAUD ..........................................22

CONCLUSION .....................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>Case</u>                                                                                                    <u>Page(s)</u>

*200 East End Ave. Corp v. General Electric*,
    172 N.Y.S.2d 409 (1st Dep't 1958) ................................................................. 18

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    No. 08-cv-7508 (S.D.N.Y.) ................................................................. 9, 10, 20

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009) ................................................. 12, n.11, 16

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    888 F. Supp. 2d 431 (S.D.N.Y. 2012) ................................................................. 20

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
    404 F.3d 566 (2d Cir. 2005) ................................................................. 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................. 10

*Buechner v. Avery*,
    836 N.Y.S.2d 1 (1st Dep't 2007) ................................................................. 18

*Calcutti v. SBU, Inc.*,
    224 F. Supp. 2d 691 (S.D.N.Y. 2002) ................................................................. 4, n.2

*Chevron Corp. v. Donziger*,
    871 F. Supp. 2d 229 (S.D.N.Y. 2012) ................................................................. 23

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ................................................................. 23, n.17

*DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*,
    15 N.Y.3d 147 (2010) ................................................................. 16

*Deutsche Zentral-Genossenschaftsbank AG v. UBS AG*,
    No. 652575/2012, 2014 N.Y. Misc. LEXIS 1858 (N.Y. Sup. Ct. Apr. 17, 2014) ............ 6

*Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co.*,
    No. 09-cv-9802, 2010 WL 1838730 (S.D.N.Y. May 4, 2010) ........................................ 3

*Finn v. Barney*,
    471 Fed. Appx. 30 (2d Cir. 2012) ................................................................. 8, n.6, 9, n.9

*Gilmore v. Gilmore*,
     No. 09-cv-6230, 2010 WL 4910211 (S.D.N.Y. Nov. 15, 2010)......................................4

*Gordon & Co. v. Ross*,
     63 F. Supp. 2d 405 (S.D.N.Y. 1999).................................................................................4

*Harris v. City of N.Y.*,
     186 F.3d 243 (2d Cir. 1999)..............................................................................................3

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
     No. 13-cv-2107, 2014 U.S. Dist. LEXIS 77068 (S.D.N.Y. May 28, 2014) .............8, n.7

*HSH Nordbank AG v. Barclays Bank PLC*,
     No. 652678/2011, 2014 N.Y. Misc. LEXIS 845
     (N.Y. Sup. Ct. Mar. 3, 2014) ........................................................................6, 13, n.12

*HSH Nordbank AG v. Goldman Sachs Group, Inc.*,
     No. 652991/12, 2013 N.Y. Misc. LEXIS 6546
     (N.Y. Sup. Ct. Nov. 26, 2013) ..............................................................................6, 9, 15

*Jimenez v. Brazil Ethanol*,
     No. 11-cv-3635, 2012 WL 696396 (SD.N.Y. Feb. 29, 2012) ..................................18, 19

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
     295 F. Supp. 2d 366 (S.D.N.Y. 2003)................................................................................4

*Kashi v. Gratsos*,
     790 F.2d 1050 (2d Cir. 1986)...........................................................................................23

*Keller v. Levy*,
     40 N.Y.S.2d 580(1st Dep't 1943) ....................................................................................20

*King County v. IKB Deutsche Industriebank AG*,
     No. 09-cv-08387 SAS (S.D.N.Y.) .......................................................7, 8, 9, 10, 13, 14

*King County v. IKB Deutsche Industriebank AG*,
     708 F. Supp. 2d 334 (S.D.N.Y. 2010)................................................................................8

*Kirch v. Liberty Media*,
     449 F.3d 388 (2d Cir. 2006) ............................................................................................23

*Knight Secs. L.P. v. Fiduciary Trust Co.*,
     5 A.D.3d 172, 774 N.Y.S.2d 488 (1st Dep't 2004) ........................................................16

*Landesbank Baden-Württemberg v. RBS Holdings USA, Inc.*,
No. 12-cv-5476, 2014 U.S. Dist. LEXIS 49840 (S.D.N.Y. Apr. 9, 2014) .......... 6, 11, 15

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005).......................................................................... 3

*MBIA Ins. Co. v. GMAC Mortgage LLC*,
914 N.Y.S.2d 604 (N.Y. Sup. Ct. 2010) ...................................................... 16

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*,
23 F. Supp. 2d 439 (S.D.N.Y. 1998)...................................................... 4, n.2

*Merck v. Reynolds*,
559 U.S. 633 (2010)........................................................................... 5, n.4

*N.J. Carpenters Health Fund v. Residential Capital LLC*,
No. 08-CV-8781, 2011 U.S. Dist. LEXIS 46066 (S.D.N.Y. Apr. 28, 2011).................. 11

*Ortiz v. Cornetta*,
867 F.2d 146 (2d Cir. 1989)............................................................................ 3

*Phoenix Light SF Ltd. v. ACE Sec. Corp.*,
No. 650422/2012, 2013 WL 1788007 (N.Y. Sup. Ct. Apr. 24, 2013)................. 6, 12, 13

*Public Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
No. 09-cv-1110, 2011 U.S. Dist. LEXIS 3267 (S.D.N.Y. Jan. 12, 2011) ................. 9, 11

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*,
714 F. Supp. 2d 475 (S.D.N.Y. 2010)............................................................ 14

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
277 F.R.D. 97 (S.D.N.Y. 2011) ............................................................ 13, n.12

*STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*,
648 F.3d 68 (2d Cir. 2011).................................................................... 15, 16

*Stuart v. Am. Cyanamid Co.*,
158 F.3d 622 (2d Cir. 1998)........................................................................... 4

*Tabak v. Canadian Solar Inc.*,
549 F. App'x 24 (2d Cir. 2013) ................................................................ 11, 12

*VNB Realty, Inc. v. Bank of Am. Corp.*,
No. 11-cv-6805, 2013 U.S. Dist. LEXIS 132250 (S.D.N.Y. Sept. 16, 2013) .......... 8, n.7

*World Wrestling Fed'n Entm't, Inc. v. Bozell*,
    142 F. Supp. 2d 514 (S.D.N.Y. 2001)............................................................... 20

## <u>OTHER AUTHORITIES</u>

CPLR 3016(b) ................................................................................................................ 12

Fed. R. Civ. P. 8(c) ......................................................................................................... 3

Fed. R. Civ. P. 44.1 ........................................................................................................ 1

Plaintiff IKB Deutsche Industriebank AG ("IKB") respectfully submits this memorandum of law, together with the Declarations of Prof. Dr. Heinz-Peter Mansel (hereinafter, "Mansel") and Jeffrey Coviello (hereinafter, "Coviello"), each dated July 24, 2014, in opposition to the motion to dismiss the Amended Complaint filed by Defendant McGraw Hill Financial, Inc. (f/k/a The McGraw-Hill Companies, Inc.) (d/b/a Standard & Poor's Rating Services)) ("S&P").[1]

## PRELIMINARY STATEMENT

In June 2007, S&P gave its highest possible ratings to the Senior Notes issued by the Rhinebridge structured investment vehicle, as well as to the vehicle itself, signaling to the market its view of the extreme safety and security of those instruments and that structure.  A mere three months later, those purportedly safe securities, along with other highly rated Rhinebridge Notes, were downgraded to "junk," causing IKB, as an investor in Rhinebridge, hundreds of millions of dollars of losses.  In January 2013, Judge Shira A. Scheindlin ruled that claims by *other* Rhinebridge investors harmed by the same fraud could proceed to trial against S&P.  S&P promptly entered into a settlement of those claims.

IKB was situated no differently than any other investor when it invested hundreds of millions of dollars in Rhinebridge Notes on the basis of the truthfulness and integrity of S&P's credit ratings, only to see those ratings – and its investment – vanish within a matter of *three months*.  IKB brings this action to hold S&P accountable for the severe consequences of this ratings fraud.  S&P's motion to dismiss makes very narrow and fact-dependent challenges to the Amended Complaint, which are without merit and, in any event, cannot be granted at this stage

---

[1] Pursuant to Fed. R. Civ. P. 44.1, IKB hereby provides the Court with notice of its intent to raise an issue about German law.  *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence").

of the proceedings.

First, S&P does not and cannot show that IKB's claims are time-barred as a matter of law. S&P concedes that IKB's claims are timely under New York's six-year limitations period. S&P contends, however, that IKB's claims are untimely under German law, which S&P says applies under the New York borrowing statute. But as reflected in the their reports, the parties' German law experts agree that the applicable limitations period under German law does not begin to run until IKB had actual knowledge of *facts* – not mere *allegations* – sufficient to establish S&P's fraud. The question of IKB's knowledge, *including knowledge of S&P's fraudulent intent*, for purposes of triggering the German statute of limitations is of course a factual issue not appropriate for resolution on a motion to dismiss. Further, S&P relies almost exclusively upon the filing of a complaint by other investors against S&P concerning Rhinebridge in October 2009 as the basis for IKB's purported knowledge of its fraud-based claims against S&P. However, discovery did not proceed in that action before 2010, and the court did not determine S&P's motion to dismiss before 2010. Simply put, unsubstantiated *allegations* in a complaint (which S&P strenuously denied) do not come close to demonstrating that IKB, as a matter of law, knew *facts* sufficient to support its claims against S&P.

Second, on the sufficiency of the pleading, S&P does not challenge the adequacy of the allegations that it fraudulently issued false and misleading ratings on the Rhinebridge structure, the Rhinebridge Notes, and the assets underlying the Rhinebridge Notes. Indeed, Judge Scheindlin already held in the prior Rhinebridge case that the evidence of S&P's fraudulent conduct was sufficient to go to trial. On this motion, S&P only disputes IKB's actual and reasonable reliance upon S&P's ratings, and then only with respect to certain narrow topics. However, reliance is inherently a fact-laden inquiry that is not susceptible to resolution on a

motion to dismiss.  Moreover, the Amended Complaint extensively details both IKB's general

reliance on S&P's ratings with respect to the Rhinebridge structure, the Rhinebridge Notes, and

the assets underlying the Rhinebridge Notes, and IKB's specific reliance on S&P's ratings in

connection with each of IKB's purchases of Rhinebridge Notes.  S&P's arguments either

contradict or ignore the well-pleaded allegations in the Amended Complaint and therefore, at

best, raise issues of fact.

<u>Finally</u>, contrary to S&P's motion, IKB's civil conspiracy claim is connected to the

underlying fraud alleged in the Amended Complaint, and is therefore actionable.

## ARGUMENT

## I.   THE LEGAL STANDARD

"[I]t is black-letter law that in resolving a motion to dismiss, the Court must accept

Plaintiffs' factual allegations as true."  *Ellington Long Term Fund, Ltd. v. Goldman, Sachs &*

*Co.*, No. 09-cv-9802, 2010 WL 1838730, at *4 (S.D.N.Y. May 4, 2010) (internal citations

omitted).  "Plaintiffs' obligation to produce evidence at the motion to dismiss stage is even

further reduced in the context of a motion to dismiss premised on the statute of limitations—an

affirmative defense on which the defendant bears the burden of proof."  *Id.*; *see also* Fed. R. Civ.

P. 8(c).  Courts routinely hold that the fact-intensive inquiries necessary to resolve limitations

questions are inappropriate for resolution at the motion to dismiss stage.  *See Lentell v. Merrill*

*Lynch & Co.*, 396 F.3d 161, 168-69 (2d Cir. 2005).  A motion to dismiss premised on the statute

of limitations cannot be granted "unless it appears beyond doubt that the plaintiff can prove no

set of facts in support of [its] claim which would entitle [it] to relief."  *Ortiz v. Cornetta*, 867

F.2d 146, 148 (2d Cir. 1989) (internal quotation marks omitted).  "[S]urvival of a Rule 12(b)(6)

motion to dismiss on statute of limitations grounds requires only allegations consistent with a

claim that would not be time-barred."  *Harris v. City of N.Y.*, 186 F.3d 243, 251 (2d Cir. 1999).

3

## II.   IKB'S CLAIMS ARE TIMELY

"[W]hen a nonresident sues based upon a cause of action that accrued outside of New York, 'the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued.'" *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 380 (S.D.N.Y. 2003) (quoting *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998)); *Gordon & Co. v. Ross*, 63 F. Supp. 2d 405, 409 (S.D.N.Y. 1999) ("Under the borrowing statute, 'the entire foreign statute of limitations applies, and not merely its period'")). S&P does not even contend that IKB's claims are untimely under New York's six-year limitations period applicable to IKB's claims.[2]  Nor could it, as IKB did not purchase any Rhinebridge Notes in reliance on S&P ratings until June 27, 2007, less than six years before the May 10, 2013 effective date of the parties' tolling agreement, the expiration of which was followed by IKB's immediate filing of this action. *See* S&P Br. at 10. S&P's concession that IKB's claims are timely under New York law is dispositive because the applicable German limitations period is *longer* than the applicable New York limitations period. Whereas the applicable New York limitations period arguably would have expired on June 27, 2013 (absent the parties' tolling agreement), the applicable German limitations period, as demonstrated below, would not have expired until December 31, 2013 (absent the parties' tolling agreement) *at the earliest*. Because S&P only asserts that IKB's claims are untimely under German law, IKB responds to that argument below.

---

[2] *See, e.g.*, *Gilmore v. Gilmore*, No. 09-cv-6230, 2010 WL 4910211, at *3 (S.D.N.Y. Nov. 15, 2010) (six-year statute of limitations for common law fraud); *Calcutti v. SBU, Inc.*, 224 F. Supp. 2d 691, 701 (S.D.N.Y. 2002) (six-year statute of limitations for negligent misrepresentation); *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 449-50 (S.D.N.Y. 1998) (six-year statute of limitations for civil conspiracy claim sounding in fraud).

### A.  The Standard for Triggering the German Statute of Limitations Is Rigorous, Fact-Intensive, and Almost Never Subject to Resolution on a Motion to Dismiss

The German statute of limitations applicable to IKB's claims is the standard three-year limitation period under German Civil Code, § 195 (1) BGB.  Mansel ¶ 6(2).[3]  However, the German statute of limitations does not begin to run until the *end* of the year in which (i) the claim arose *and* (ii) the plaintiff obtains knowledge of the circumstances giving rise to the claim and of the identity of the defendant, or would have obtained such knowledge if he had not shown gross negligence.  Mansel ¶¶ 6(3), 9.  As S&P acknowledges, "the German statute of limitations looks to what *facts* the plaintiff knew and when it knew them in determining whether and when plaintiff had 'knowledge' of sufficient facts on which to assert a claim."  S&P Br. at 8 (emphasis added).  And German law requires knowledge of sufficient *facts* indicative of each element of a claim in order to trigger the statute of limitations.  Mansel ¶¶ 6(5), 14-16.  Thus, with respect to IKB's fraud claims, awareness that the at-issue ratings were erroneous is not enough.  Rather, IKB must have had awareness of *facts* indicating that S&P *intentionally* issued baseless ratings.[4]

If, as here, a defendant cannot demonstrate that the plaintiff had actual knowledge of facts sufficient to establish its claims, the question becomes whether the plaintiff was grossly negligent in not knowing such facts.  Under German law, gross negligence requires a breach of due care that is *objectively substantial* and *subjectively inexcusable*.  Mansel ¶¶ 6(9), 21-24.  The objective condition is fulfilled if obvious considerations suggested themselves, but were not

---

[3] In his Declaration, Prof. Dr. Mansel has written paragraph numbers in the *far right column* of each page.  The "BGB" is the German Civil Code.  *See* Mansel ¶ 2.

[4] In this regard, the German standard, although more rigorous, is generally consistent with U.S. law. *See Merck v. Reynolds*, 559 U.S. 633, (2010) ("A plaintiff cannot recover without proving that a defendant made a material misstatement *with an intent to deceive* . . . . It would therefore frustrate the very purpose of the discovery rule . . . if the limitations period began to run regardless of whether a plaintiff had discovered any facts suggesting scienter").

made or were cast aside.  Mansel ¶¶ 6(9), 22.  The subjective condition is fulfilled where the plaintiff acts *incomprehensibly*, *inexcusably*, and in a *personally substantial manner against his own interest*.  Mansel ¶ 22.  The defendant's burden of proving such gross negligence is much more rigorous and fact-intensive than the already fact-intensive concept of "inquiry notice" under U.S. law.  Mansel ¶¶ 6(9), 11, 21-22.

Given these standards, U.S. courts have uniformly refused to dismiss similar claims under the German statute of limitations, holding that the issue of when a plaintiff had actual knowledge of, or was grossly negligent in not knowing, the facts constituting its claim is too fact-intensive for resolution at the pleading stage.  *See, e.g.*, *Landesbank Baden-Württemberg v. RBS Holdings USA, Inc.*, No. 12-cv-5476, 2014 U.S. Dist. LEXIS 49840, at *30-31 (S.D.N.Y. Apr. 9, 2014) ("A determination as to when Plaintiffs knew or were grossly negligent in not knowing about their claims must await the development of a more complete factual record"); *Deutsche Zentral-Genossenschaftsbank AG v. UBS AG*, No. 652575/2012, 2014 N.Y. Misc. LEXIS 1858, at *2 (N.Y. Sup. Ct. Apr. 17, 2014) ("[D]efendants have not eliminated triable issues of fact as to whether the German statute of limitations is a bar to this action"); *HSH Nordbank AG v. Barclays Bank PLC*, No. 652678/2011, 2014 N.Y. Misc. LEXIS 845(N.Y. Sup. Ct. Mar. 3, 2014) (denying motion to dismiss based on German statute of limitations); *HSH Nordbank AG v. Goldman Sachs Grp., Inc.*, No. 652991/12, 2013 N.Y. Misc. LEXIS 6546 (N.Y. Sup. Ct. Nov. 26, 2013) (same); *Phoenix Light SF Ltd. v. ACE Sec. Corp.*, No. 650422/2012, 2013 WL 1788007 (N.Y. Sup. Ct. Apr. 24, 2013) (same).  S&P provides no basis for a different result here.

**B.  IKB's Claims Are Not Barred by the German Statute of Limitations**

IKB did not have knowledge of facts sufficient to support its claims—including that S&P knowingly and intentionally issued false Rhinebridge ratings and that S&P's ratings fraud caused IKB's Rhinebridge losses—before 2010, at the earliest.  Therefore, as explained in the declaration of Prof. Dr. Mansel, the *earliest* the German three-year statute of limitations arguably could have begun to run was December 31, 2010.  Mansel ¶¶ 6, 38.  Because IKB's claims were tolled effective May 10, 2013 by the parties' agreement – *prior to* the December 31, 2013 expiration of the German limitations period under the earliest possible scenario – and IKB's original complaint was promptly filed upon the expiration of the tolling agreement on May 12, 2014, IKB's claims are timely under German law.  Indeed, Prof. Dr. Mansel concludes that a German court applying German law would consider all of IKB's claims in this action to be timely filed.  Mansel ¶¶ 6, 38.

S&P fails to point to any pre-2010 publicly available facts indicating that S&P knowingly (or even negligently) inflated its Rhinebridge-related ratings.  Rather, S&P's motion is based almost entirely on an irrelevant discussion of when IKB had knowledge of unsubstantiated *allegations* against S&P in the action entitled *King County v. IKB Deutsche Industriebank AG*, No. 09-cv-08387 SAS (S.D.N.Y.) (hereinafter, "*King County*") before Judge Scheindlin that was filed in October 2009.[5]  Significantly, no discovery in the *King County* action was even

---

[5] *See, e.g.*, S&P Br. at 2 ("IKB had knowledge of the core factual *allegations* underlying its claims . . . ."); *id.* at 5 ("IKB had knowledge of the core factual *allegations* underling its claims here . . . ."); *id.* at 8 ("IKB had knowledge of the core factual *allegations* underlying its claims"); *id.* at 10 ("IKB had actual knowledge of the factual *allegations* giving rise to its claims and the identity of the defendant . . . .") (emphasis added to all above quotations).

permitted before 2010.[6]  Moreover, Judge Scheindlin did not determine S&P's motion to dismiss

the complaint until April 2010.  *King County*, 708 F. Supp. 2d 334 (S.D.N.Y. 2010).  Thus, all

that existed before 2010 were unsubstantiated allegations[7] that S&P denied vigorously at the

time and denies vigorously to this day.  Mere allegations or suspicion of facts is not enough to

trigger the German statute of limitations.  Mansel ¶¶ 6(6), 16, 32, 34, 36, 60, n.51.  S&P's own

expert agrees that plaintiff's "knowledge of *facts*" – not mere allegations – is necessary to trigger

the start of the limitations period.  Nedden ¶ 44 (emphasis added).[8]

Additionally, IKB had every reason *not* to believe the allegations against S&P in the *King*

*County* complaint before 2010, at the very earliest.  <u>First</u>, IKB knew that the *King County*

allegations against IKB itself were false, giving it no reason to credit the allegations against

---

[6] *See* Coviello Ex. 3 (December 11, 2009 Scheduling Order in *King County* (Dkt. No. 35), p. 4
("The parties shall serve initial disclosures on January 15, 2010.  Requests for production of
documents shall be served by Plaintiff and Defendants by January 22, 2010.  Production of
documents in response to those requests shall commence by March 1, 2010")).  The Court may
take judicial notice of the *King County* Scheduling Order.  *See Finn v. Barney*, 471 Fed. Appx.
30, 32 (2d Cir. 2012).

[7] Indeed, IKB could not have properly relied on the unsubstantiated allegations against S&P in
*King County* without conducting its own independent investigation and verification of the facts,
which, as alleged in the Amended Complaint, it could not have done until discovery was
conducted in 2010 (at the earliest).  Am. Compl. ¶¶ 21-22; *see VNB Realty, Inc. v. Bank of Am.
Corp.*, No. 11-cv-6805, 2013 U.S. Dist. LEXIS 132250, at *23-24 (S.D.N.Y. Sept. 16, 2013)
(dismissing complaint where plaintiff relied on allegations in prior complaint without conducting
independent investigation); *see also Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 13-
cv-2107, 2014 U.S. Dist. LEXIS 77068, at *19-20 (S.D.N.Y. May 28, 2014) ("Rule 11 seems to
allow incorporation of allegations from other complaints if they are combined with material the
plaintiff has investigated personally that lends credence to the borrowed allegations").

[8] "Nedden" refers to the Declaration of Jan Heiner Nedden submitted in support of S&P's
motion to dismiss.  On this distinction between facts and allegations, Mr. Nedden acknowledges
that while he was asked to make various assumptions in connection with his declaration,
including the truth of the allegations in this case, he understands that S&P disagrees with many
of those allegations.  *See e.g.*, Nedden ¶ 35 ("I have been asked by U.S. counsel for Defendant to
assume the allegations of the [Amended] Complaint to be true for purposes of my present
analysis, though I understand that Defendant disagrees with many of the allegations").

S&P.  Second, both before and after 2010, S&P publicly denied the type of allegations lodged

against it in the *King County* complaint.[9]  On top of that, 2008 and 2009 undeniably was a period

of great dislocation in the U.S. economy where many market participants were attempting to

determine the causes for their economic losses without access to the internal documents of the

parties, such as S&P, that had caused the losses.  Even under the somewhat more lenient U.S.

standard, courts have held that such mixed information would not put a plaintiff on notice of its

claims.  *See, e.g.*, *Public Emps. Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, No. 09-cv-1110,

2011 U.S. Dist. LEXIS 3267, at *26 (S.D.N.Y. Jan. 12, 2011) ("Defendants base their argument

on the fact that Fitch, Moody's, and S&P placed all classes of the GSAMP 2006-S2 Certificates

on 'negative watch' and downgraded their ratings of the Certificates by December 2007.  While

this may have been an indication that the Certificates were performing badly, it does not

constitute 'triggering information [that] relate[s] directly to the misrepresentations and

omissions' that the Plaintiff alleges in the SAC"); *see also HSH Nordbank AG, et al. v. Goldman

Sachs Grp., Inc., et al*, No. 652991/12, 2013 N.Y. Misc. LEXIS 6546 (N.Y. Sup. Ct. Nov. 26,

2013).  Under the more rigorous German standard, IKB certainly cannot be found grossly

negligent as a matter of law for not discerning all the facts necessary to bring its instant claims in

---

[9] *See, e.g.*, Coviello Ex. 1 (S&P Answer to Second Am. Compl. in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08-cv-7508 (S.D.N.Y.), Dkt. No. 78).  S&P made other public statements specifically denying any wrongdoing in connection with Rhinebridge and similar transactions.  *See, e.g.*, Coviello Ex. 2 (S&P Answer in *King County*, (Dkt. No. 105) (filed May 11, 2010)); Coviello Ex. 4 ("The McGraw-Hill Companies Comments on Court's Decision to Dismiss Majority of Claims Made Against Standard & Poor's," Sept. 3, 2009, S&P Press Release ("'We are pleased that the Court has dismissed all but one of the eleven claims [in *Abu Dhabi*], and we are confident that we will prevail on the remaining claim'"")); Coviello Ex. 5 ("S&P, Moody's Settle Ratings Lawsuit," April 26, 2013, *Wall Street Journal* ("S&P has said the suits are 'meritless.'. . . In a statement, a McGraw-Hill spokesman said the company settled the Abu Dhabi case "without any admission of liability or wrongdoing")).  *See Finn v. Barney*, 471 Fed. Appx. 30, 32 (2d Cir. 2012) (taking judicial notice of materials that "were offered to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings").

the less than three months between the filing of the *King County* complaint and the end of 2009 in light of the lack of any discovery in that action until 2010 and of the contested information concerning S&P's conduct.[10]

S&P's reliance on the August 2008 complaint in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08-cv-7508 (S.D.N.Y.) ("*Abu Dhabi*") is even more ineffective as that complaint did not even relate to Rhinebridge. And the *Abu Dhabi* court's denial of a motion to dismiss in 2009 did not somehow convert *allegations* regarding a different set of transactions into actual known *facts*. Surviving the motion to dismiss meant only that, accepting all of plaintiffs' allegations and drawing all reasonable inferences in plaintiffs' favor, the *Abu Dhabi* complaint stated a plausible enough claim for the case to move beyond the pleading stage. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Apart from unsubstantiated allegations in complaints, the only pre-2010 "facts" that S&P relies upon are: (1) Rhinebridge's downgrades and defaults (S&P Br. at 8-9); (2) S&P's economic incentive to provide ratings (*id*. at 12); (3) an S&P instant message (unrelated to Rhinebridge) stating to the effect that a deal "could be structured by cows and [S&P] would rate it" (*id*. at 13); and (4) a Bloomberg article (also unrelated to Rhinebridge) reporting that a former S&P employee stated that "[S&P] thought they had discovered a machine for making money that would spread risks so far that nobody would ever get hurt." (*id*.) These four items do not come

---

[10] Under German law, only after the plaintiff can no longer reasonably have any significant doubts about which of the several potentially liable persons is responsible, does he have sufficient knowledge of the identity of the responsible defendant. Mansel ¶ 14. Nedden provides no opinion on this key question of when IKB had actual knowledge (or grossly negligent ignorance) of the identity of the responsible defendant (Nedden ¶ 43) ("It is my understanding that Plaintiff had knowledge of Defendant's identity in 2007"). Here, it was entirely reasonable for IKB to presume that parties other than S&P (*e.g.*, RMBS issuers or subprime mortgage originators) might be responsible for its Rhinebridge losses. Indeed, as S&P points out, IKB in fact sued other market participants.

close to providing IKB sufficient *facts* to base its fraud-based claims against S&P.

First, it is well-settled that rating downgrades and defaults do not provide facts supporting

a fraud claim:

> As evidence that Plaintiffs knew or should have known of their
> claims, Defendants point to media reports, ratings downgrades,
> monthly reports showing spikes in delinquencies in the underlying
> mortgages of the securitizations at issue, RMBS lawsuits, and the
> known economic losses on the Certificates.   Even assuming,
> arguendo, that German law requires a plaintiff to monitor foreign
> news and litigation, it does not follow that Plaintiffs were or should
> have been on notice of their fraud claims.   The information cited
> by Defendants is not necessarily indicative of misrepresentation or
> scienter, two key elements of Plaintiffs' fraud claim.

*Landesbank Baden-Württemberg*, No. 12-cv-5476, 2014 U.S. Dist. LEXIS 49840, at \*30-31

(citations omitted); *see also N.J. Carpenters Health Fund v. Residential Capital LLC*, No. 08-

CV-8781, 2011 U.S. Dist. LEXIS 46066, at \*25-26 (S.D.N.Y. Apr. 28, 2011) (finding high

delinquency rates and possible ratings downgrades in themselves do not establish

misrepresentations and so do not trigger statute of limitations); *Pub. Emps'. Ret. Sys. of Miss. v.*

*Goldman Sachs & Co.*, No. 09-CV-1110, 2011 U.S. Dist. LEXIS 3267, at \*26-27 (S.D.N.Y. Jan.

12, 2011) (holding downgrades do not give rise to notice even under strict liability provisions of

federal Securities Act of 1933).

Second, the fact that S&P had financial incentives to provide ratings does not alone

provide a sufficient basis to demonstrate that S&P intentionally misrepresented the Rhinebridge-

related ratings.   Many courts have held that economic incentives to earn profit are insufficient

standing alone to allege intentional misconduct.   *Landesbank Baden-Württemberg*, No. 12-cv-

5476, 2014 U.S. Dist. LEXIS 49840, at \*32-33 ("Plaintiffs do not argue that Defendants had a

motive to make fraudulent misrepresentations 'beyond a general profit motive common to all

corporations, which does not suffice'"); *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 28-29

(2d Cir. 2013) ("[T]he general motivation to act in one's own economic self[-]interest is insufficient to allege motive").  Thus, S&P's economic incentives alone could not have provided IKB sufficient facts to show that S&P knowingly issued false ratings.[11]

Third, the pre-2010 S&P instant message and the former S&P employee's statement in the Bloomberg article are exactly what S&P contends it is *not* relying upon—*i.e.*, "a litany of market developments or broad statements in the press that might have put the plaintiff on notice of its potential claim."  S&P Br. at 4.  The two pre-2010 S&P statements referenced in S&P's brief are general statements not tied to Rhinebridge in any way, and they only acquire significance when combined with the wealth of other information obtained in governmental investigations and Rhinebridge discovery in other litigation since 2010.  As for the general news reports cited by Nedden (which S&P does not even address in its brief), they provided IKB with no concrete *facts* concerning S&P's misconduct *and* fraudulent intent in connection with the Rhinebridge credit ratings at issue here.  Courts repeatedly hold that such general news reports are insufficient to state fraud claims.  For example, in *Phoenix Light SF Ltd. v. ACE Sec. Corp.*, a New York state court held:

> Moreover, had plaintiffs sued defendants in 2008 based on the cited newspaper reports, this court would likely have dismissed the complaint for failure to plead scienter. The requirement, pursuant to CPLR 3016(b), that a plaintiff alleging fraud must plead scienter with particularity is meant to protect defendants, such as Deutsche Bank, from lawsuits based on mere conjecture that serve as fishing expeditions where the plaintiff rummages thought [sic] defendants' records hoping to uncover a smoking gun. Defendants cannot turn that protection on its head by contending that the time to bring a

---

[11] *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp.2d 155, 179 (S.D.N.Y. 2009) does not stand for a different rule.  *See* S&P Br. at p. 12 n.15.  Indeed, as Judge Scheindlin recognized:  "There is no question that companies can conduct business legally, even in the face of conflicts of interest, provided that proper safeguards are in place. The existence of conflicts of interest alone typically is not sufficient to establish that defendants 'knowingly' made a false and misleading statement."  651 F. Supp.2d at 178-79.

fraud claim begins to run before a viable complaint can be filed.

No. 650422/2012, 2013 WL 1788007, at *5 (N.Y. Sup. Ct. Apr. 24, 2013).[12]  Indeed, Prof. Dr.

Mansel has analyzed the four pre-2010 "facts" referenced in S&P's brief and concluded that a

German court would dismiss IKB's claims if based only on those facts.  Mansel ¶¶ 16, 36, 67-69.

It was only beginning in 2010 that information gradually became available to IKB

concerning S&P's intentional fraud with respect to the Rhinebridge ratings:

- Beginning in 2010, discovery from S&P in *King County* began to substantiate allegations against S&P concerning Rhinebridge ratings, despite S&P's ongoing denials.  *See, e.g.*, Am. Compl. ¶¶ 21-22.

- In 2011, the Financial Crisis Inquiry Commission and the United States Senate Permanent Subcommittee on Investigations issued findings concerning the activities of S&P.  These findings were reached after years of investigation aided by the power to issue subpoenas to compel testimony and the production of documents.  *See, e.g.*, Am. Compl. ¶ 146 ("The credit rating agencies assured Congress and the investing public that they could 'manage' these conflicts, ***but the evidence indicates that the drive for market share and increasing revenues, ratings shopping, and investment bank pressures have undermined the ratings process and the quality of the ratings themselves***") (citing Senate Subcommittee Report); Am. Compl. ¶ 148 ("The Commission concludes that the credit rating agencies ***abysmally failed in their central mission to provide quality ratings*** on securities for the benefit of investors") (citing FCIC Report).

- Key evidence concerning S&P's intentionally inflated Rhinebridge ratings emerged during the *King County* summary judgment briefing in 2012.  These included highly confidential internal S&P documents and testimony from senior S&P personnel reflecting, among other things, that (i) S&P knowingly issued ratings that were not reflective of the true risk of asset-backed securities, (ii) S&P knew well before it issued the Rhinebridge ratings that ratings on sub-prime RMBS, such as those underlying Rhinebridge, were "not going to hold through 2007," and (iii) S&P's ratings on structured investment vehicles like Rhinebridge

---

[12] *See also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 116 (S.D.N.Y. 2011) ("While Defendants cite to generic news reports regarding the mortgage-backed securities market, these reports do not directly focus on the Certificates here at issue"); *HSH Nordbank AG v. Barclays Bank PLC*, No. 652678/2011, 2014 N.Y. Misc. LEXIS 845, at *19-20 (N.Y. Sup. Ct. Mar. 3, 2014) ("Courts have repeatedly denied limitations-based motions to dismiss in RMBS cases, even under a reasonable diligence standard, based on publicly available information as of 2007 or as late as mid-2008. Courts have reasoned that such information did not demonstrate scienter on the defendant's part, or did not relate directly to the misrepresentations alleged in the complaint or to the specific securitizations").

were inappropriate because the ratings on the underlying assets were faulty.  *See, e.g.*, Am. Compl. ¶ 23.

- In January 2013, the *King County* court denied S&P's motion for summary judgment, finding sufficient evidence warranting a trial on S&P's fraud.  *See, e.g.*, Am. Compl. ¶ 21.

None of this information was available to IKB before 2010, as IKB had no means of accessing S&P's internal documents or testimony of its senior personnel through litigation discovery or otherwise before 2010.  As S&P's own expert states, "[a] plaintiff is only required to consult the sources of information available to him or at least accessible to him."  Nedden ¶ 29.  As soon as IKB ascertained these facts, IKB, as S&P acknowledges, immediately pursued its claims against S&P, entered a tolling agreement with S&P, and then promptly commenced this action against S&P upon expiration of the tolling agreement.  S&P Br. at 10.  Thus, S&P cannot reasonably allege any delay by IKB in bringing this action or claim any surprise over it.  S&P Br. at p.5 n.9.[13]

By relying solely on unsubstantiated allegations and general press reports, S&P is trying to import the inquiry notice standard, contrary to the much more rigorous German law standard. But S&P cannot choose the three-year German statute of limitations yet disregard its accompanying more rigorous trigger standard.  Nevertheless, even under the more lenient U.S. "inquiry notice" rule, courts have found substantially similar arguments as raised by S&P to be inappropriate for resolution on a motion to dismiss.  *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 480 (S.D.N.Y. 2010) (Rakoff, J.) (denying limitations-based motion to dismiss because the competing materials show "there are plausible

---

[13] S&P heavily focuses on similarities between IKB's Amended Complaint and the *King County* complaint, S&P Br. at 2, 12, but of course they contain similarities.  In January 2013, following discovery in the *King County* action, the Court determined at the summary judgment stage that *the evidence* supporting the allegations in the *King County* complaint was such that a reasonable jury could decide in plaintiff's favor.  Many of these now substantiated allegations are relevant to this action and thus IKB's Amended Complaint unsurprisingly includes similar allegations.

inferences to be drawn in either direction" and thus "the issue of whether a plaintiff had

sufficient facts to place it on inquiry notice is . . . inappropriate for resolution on a motion to

dismiss under Rule 12(b)(6) . . . ."); *see also Landesbank Baden-Württemberg*, No. 12-cv-5476,

2014 U.S. Dist. LEXIS 49840, at *30-31 ("Limitations-based arguments in RMBS fraud actions

have not generally been accepted at the motion to dismiss phase") (quoting *HSH Nordbank*, 2013

N.Y. Misc. LEXIS 6546, at *5).

In sum, there is no disagreement that S&P must demonstrate on this motion to dismiss

that IKB was aware of sufficient *facts* (or was grossly negligent in not becoming aware of them)

supporting its claims against S&P.  S&P does not come close to satisfying this heavy burden.

Unsubstantiated *allegations* and general press reports simply are not "facts" sufficient to support

IKB's claims against S&P.  At most, S&P raises factual issues concerning what IKB knew and

when it knew, which cannot be resolved on a motion to dismiss.

## III.   THE AMENDED COMPLAINT STATES CLAIMS FOR COMMON LAW FRAUD AND NEGLIGENT MISREPRESENTATION

Regarding the sufficiency of the pleading, S&P does not challenge the adequacy of the

allegations that it fraudulently issued false and misleading ratings on the Rhinebridge structure,

the Rhinebridge Notes, and the assets underlying the Rhinebridge Notes.  Indeed, Judge

Scheindlin already held that the evidence of S&P's fraudulent conduct in rating Rhinebridge was

sufficient to go to trial.  S&P's sole basis for dismissal of IKB's fraud and negligent

misrepresentation claims is the purported insufficiency of IKB's allegations that it relied on

S&P's ratings.  S&P's argument fails for numerous reasons.

Reliance may be alleged generally and the reasonableness of a plaintiff's reliance is

generally an issue of fact that may not be determined on a motion to dismiss.

*STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011)

("[R]easonable reliance is often a question of fact for the jury rather than a question of law for the court. . . ."); *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 156 (2010) ("If plaintiffs can prove the allegations in the complaint, whether they were justified in relying on the warranties they received is a question to be resolved by the trier of fact"); *MBIA Ins. Co. v. GMAC Mortgage LLC*, 914 N.Y.S.2d 604, 608 (N.Y. Ct. 2010) ("Reasonable reliance is a fact intensive inquiry, which should be reserved for a trier of fact").  "[A] plaintiff need only plead that he relied on misrepresentations made by the defendant since the reasonableness of his reliance generally implicates factual issues whose resolution would be inappropriate at this early stage."  *Knight Secs. L.P. v. Fiduciary Trust Co.*, 5 A.D.3d 172, 173, 774 N.Y.S.2d 488 (1st Dep't 2004) (internal quotation marks omitted).  Indeed, because "the market at large, including sophisticated investors, have come to rely on the accuracy of credit ratings and the independence of rating agencies because of their NRSRO status and, at least in this case, the Rating Agencies' access to non-public information that even sophisticated investors cannot obtain," even a sophisticated plaintiff's reliance on credit ratings is presumptively reasonable.  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 181 (S.D.N.Y. 2009).

        IKB alleges that the entire Rhinebridge structure was contingent on receipt of specific ratings for the Rhinebridge Notes and the constituent assets.  Am. Compl. ¶¶ 19, 95-98.  As a "structured investment vehicle" or "SIV," Rhinebridge's business model was premised on the spread between the interest it received on its constituent assets and the interest it paid out on the debt it issued (*i.e.*, the Rhinebridge Notes) in order to acquire those assets.  Am. Compl. ¶ 78. The model simply would not work if ratings for the Rhinebridge Notes and the constituent assets did not accurately reflect their credit quality.  Am. Compl. ¶ 122.  In other words, but for the fraudulent ratings provided by S&P and the other Rating Agencies, Rhinebridge would not have

existed and could not have operated. Am. Compl. ¶¶ 98, 122. Moreover, the Amended

Complaint specifically details IKB's reliance on the issuance, maintenance, and confirmation of

the ratings in connection with each of its purchases of Rhinebridge Notes. Am. Compl. ¶¶ 55-

57, 224-25, 234, 236-39. The Amended Complaint further explains that S&P and the other

Rating Agencies knew IKB was relying on the ratings because, among other things, IKB

expressly told them so. Am. Compl. ¶¶ 126-28, 200-04. Finally, the Amended Complaint

alleges that IKB did not know the ratings provided by S&P were false, and that no amount of

research or due diligence could have uncovered the fraud because, among other things, IKB did

not have access to S&P internal documents and other non-public data and information in S&P's

possession. Am. Compl. ¶¶ 20, 44-45, 60-61.

As discussed below, S&P ignores or mischaracterizes the allegations in the Amended

Complaint (which the Court must accept as true for purposes of this motion) that detail IKB's

reliance on S&P's ratings in purchasing the Rhinebridge Notes and cites a handful of irrelevant

cases, most of which do not even address challenges to a complaint at the pleading stage.

Moreover, S&P's reliance argument does not at all address IKB's reliance on (i) the fraudulent

issuer ratings given to the Rhinebridge structure (Am. Compl. ¶¶ 9, 118), (ii) the fraudulent

ratings given to the assets underlying Rhinebridge (Am. Compl. ¶¶ 44-45, 53, 57-60), or (iii) the

additional misstatements made by S&P in its Code of Conduct concerning the purported integrity

and objectivity of its ratings practices (Am. Compl. ¶¶ 46, 56, 123, 130-33, 202, 249).

Accordingly, S&P's motion should be denied on the independent basis that it does not challenge

IKB's allegations of reliance on these additional actionable misstatements.

### A.   IKB Was Not an "Insider" to S&P's Fraud

S&P claims that IKB is legally barred from claiming reliance because it was an "insider"

to Rhinebridge. Putting aside the factual inaccuracies, that argument assumes that IKB is

17

alleging fraud committed by *Rhinebridge*.  It is not.  IKB is alleging that S&P issued false and misleading ratings and other misstatements concerning Rhinebridge based on information known only to S&P (and, in some cases, other Rating Agencies).  Am. Compl. ¶¶ 43-48, 56.  IKB certainly had no "insider status" at S&P or the other Rating Agencies, and S&P points to nothing that suggests that IKB was aware of S&P's fraud or the falsity of S&P's ratings.  On the contrary, the Amended Complaint repeatedly alleges that IKB had no such knowledge and no ability to acquire it.  Am. Compl. ¶¶ 20, 44-45, 60-61.[14]

S&P's few cases on this point stand for the unremarkable proposition that parties who indisputably participated in or had knowledge of fraudulent conduct cannot sue for fraud.  Those authorities provide no basis for disregarding the allegations of the Amended Complaint that repeatedly disclaim any knowledge of fraud.  In *200 East End Ave. Corp v. General Electric*, a 56-year old decision dealing with installation of heating, ventilation and air-conditioning systems, the Appellate Division reversed a trial verdict based on uncontroverted evidence that the plaintiff knew the defendant's misrepresentations were false.  172 N.Y.S.2d 409, 412 (1st Dep't 1958).  In *Buechner v. Avery*, the Appellate Division affirmed dismissal of shareholders' fraud claim on the ground that the claim was derivative; the court also noted in *dicta* that the controlling shareholder could not have relied on the alleged fraud because the complaint "conceded" the controlling shareholder's knowledge.  836 N.Y.S.2d 1, 3 (1st Dep't 2007).

Finally, *Jimenez v. Brazil Ethanol* held that a "self-professed insider" of a company who purchased the company's securities before an allegedly fraudulent prospectus was issued cannot

---

[14] S&P's argument that it relied in part on a "protective capital cushion" provided by subordinated notes (some of which were purchased by IKB) in issuing its ratings is irrelevant to the issue of IKB's reliance on the ratings.  In any event, the Amended Complaint alleges that S&P determined the amount of subordination needed based on its own models, which it knew were defective and generated bogus ratings.  *See, e.g.*, Am. Compl. ¶¶ 88-91, 174-95.

both ask for judicial notice of his insider status as a basis for knowledge of what the prospectus was going to say and also disclaim knowledge of the operations of the company within his area of expertise.  No. 11-cv-3635, 2012 WL 696396 (S.D.N.Y. Feb. 29, 2012).  The Court noted that the plaintiff did not plead any facts that might explain how he was unaware of the fraud.  *Id.*  The unusual scenario presented in *Jimenez* is far removed from this case because (a) S&P's fraudulent ratings and other misstatements preceded each of IKB's Rhinebridge Note purchases; (b) IKB has pled in great detail numerous facts indicating how IKB could not possibly have known that when S&P said "AAA", S&P really meant "junk"; and (c) IKB is not an insider at the entity that committed the fraud—*i.e.*, S&P.

### B.  The Amended Complaint Alleges Actual and Reasonable Reliance on S&P Ratings in Connection with Each IKB Purchase of Rhinebridge Notes

#### 1.  *The Junior Capital Notes and Senior Capital Notes*

S&P argues that IKB could not have relied on its ratings in purchasing the Junior Capital Notes and Senior Capital Notes because S&P did not rate those particular notes.  S&P Br. at 16-17.  In this, S&P simply ignores numerous allegations in the Amended Complaint.  For example, S&P gave the Rhinebridge structure the highest issuer/counterparty rating of AAA/A-1+, Am. Compl. ¶ 9, and IKB "reasonably relied on the falsely inflated ratings assigned to the entire Rhinebridge structure" in purchasing the Rhinebridge Notes.  Am. Compl. ¶ 118.  The Amended Complaint further alleges that S&P rated approximately 100% of Rhinebridge's constituent assets, that those ratings were intentionally inflated by S&P, and that IKB relied on the ratings given in purchasing the Rhinebridge Notes, including the Junior and Senior Capital Notes.  *See*, *e.g.*, Am. Compl. ¶¶ 20, 45, 60, 246.  The fact that S&P did not separately rate the Junior and Senior Capital Notes is irrelevant at this stage of the case, because IKB has properly alleged that it relied on the other S&P ratings when it purchased the Junior and Senior Capital Notes.

S&P's reliance on *Abu Dhabi* on this point (S&P Br. at 17) is misplaced for at least four reasons.  First, the *Abu Dhabi* decision addressed a motion for summary judgment on a full factual record.  Second, the plaintiff in *Abu Dhabi* did *not* allege, as IKB alleges here, that it relied both on the ratings issued to the SIV itself and the ratings issued on the underlying assets in deciding to purchase.  Third, the court in *Abu Dhabi* actually held that S&P can be liable with respect to a security that S&P did not directly rate but was comprised of assets that S&P did rate. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 465 (S.D.N.Y. 2012) (sustaining SinoChem's claims against S&P with respect to "CCN Notes"). Fourth, the Amended Complaint alleges that S&P conspired with the other Rating Agencies to fraudulently rate structured products, including the Rhinebridge Notes.  Accordingly, regardless of whether S&P directly rated the Junior and Senior Capital Notes, S&P may be held liable for the acts of the other Rating Agencies in rating such Notes.  *See Keller v. Levy*, 40 N.Y.S.2d 580, 581-82 (1st Dep't 1943); *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F. Supp. 2d 514, 532-33 (S.D.N.Y. 2001).

### 2.  The Mezzanine Capital Notes

S&P argues that IKB could not have relied on S&P's rating of the Mezzanine Capital Notes "because IKB contractually committed to purchase such notes long before any S&P rating of the notes was issued."  S&P Br. at 17; *see* Ringel Decl., Ex. 3.  However, S&P ignores that IKB's written commitment to purchase the notes was expressly conditioned on the Rating Agencies' issuance of rating letters confirming the expected ratings.  *See* Ringel Decl., Ex. 3 at p. 6; *see also* Am. Compl. ¶ 211.  Thus, the very document on which S&P relies evidences IKB's reliance on the ratings.  None of the cases S&P cites is remotely applicable.  Each involved fraud claims based on statements made after the plaintiff had made its investment, and none involves

investments that were expressly conditioned on the receipt of representations that proved to be false.

### 3. The Commercial Paper

S&P's argument with respect to IKB's purchases of Senior Notes (*i.e.*, Commercial Paper) is similarly flawed.  S&P selectively quotes certain allegations that, according to S&P, contradict IKB's reliance allegations.  S&P Br. at 19 (citing Am. Compl. ¶¶ 234, 239).  However, those paragraphs of the Amended Complaint state in their entirety as follows:

> 234.    In reliance on the Rating Agencies' maintenance of their high ratings and touting SIV's as particularly safe in the market, IKB purchased another $110 million of Rhinebridge Junior Capital Notes in order to provide further liquidity and capital support to the vehicle.  This brought IKB's investment in the vehicle in reliance on the Rating Agencies' false ratings to $259 million.
>
> * * *
>
> 239.    None of the Rating Agencies changed the rating of any Rhinebridge securities, including the commercial paper, in the month of August 2007.  In reliance upon the maintenance of those false ratings, as well as the other statements and actions of the Rating Agencies, and in an attempt to mitigate any damages to its investment advisory/asset management business, IKB made a final investment of $20 million in Rhinebridge commercial paper, on August 31, 2007.

S&P claims these paragraphs show the "real reason" IKB purchased Rhinebridge Notes and contradict the allegations of reliance.  *Id.*  This argument is entirely meritless.  There is no inconsistency – much less a contradiction – between making an investment for a particular purpose and, at the same time, relying upon specific information in making that investment. Surely, S&P is not suggesting that IKB would have purchased the additional Rhinebridge Notes in August 2007 if it had known (as S&P did) that they were junk.  Again, S&P's argument simply raises fact issues that may not be determined on a motion to dismiss.

Similarly, S&P's argument that IKB's concerns about Rhinebridge in July and early

August 2007 rendered unreasonable IKB's reliance on the ratings ignores that S&P reaffirmed its ratings on August 14, 2007 – before IKB made its final purchases of Rhinebridge Notes. Am. Compl. ¶¶ 236, 238-39. Thus, the Amended Complaint alleges that whatever concerns IKB had in the summer of 2007 were assuaged by S&P's fraudulent reaffirmation of its ratings, which "persuaded IKB that it should commit to further support Rhinebridge." Am. Compl. ¶¶ 231, 236, 238-49.[15] S&P points to nothing that would have alerted IKB that S&P's reaffirmation of its Rhinebridge ratings was fraudulent.

Finally, S&P argues that IKB was aware that the ratings assigned to Rhinebridge commercial paper were false because IKB's subsidiary, IKB CAM, "should have" become aware that Rhinebridge was experiencing financial distress even before the Rating Agencies. S&P Br. at 20-21. This argument contradicts numerous well-pled allegations in the Amended Complaint that neither IKB nor IKB CAM had any knowledge of S&P's fraud or deficiencies in the ratings. *See, e.g.*, Am. Compl. ¶¶ 43-44.[16] S&P's arguments at best identify potential issues of fact; they provide no basis for disregarding explicit allegations in the Amended Complaint.

## IV.   THE AMENDED COMPLAINT STATES A CLAIM FOR CIVIL CONSPIRACY TO COMMIT COMMON LAW FRAUD

S&P does not dispute that IKB has adequately alleged a conspiracy between S&P and the other Rating Agencies to artificially inflate credit ratings assigned to structured products such as the Rhinebridge Notes and their underlying assets. S&P's two-sentence argument for dismissal of the civil conspiracy claim is that the claim asserts an "independent" tort of conspiracy. This is

---

[15] Moreover, the Amended Complaint alleges that IKB in 2007 was concerned about lack of liquidity in the market and not credit risk due to defective mortgage loans. Am. Compl. ¶ 219 ("IKB understood the market was tightening, but believed this was a market event driven by liquidity, not a credit event driven by bad loans").

[16] *See also* Am. Compl. ¶ 8 ("IKB CAM operated as an independent advisory business, with an ethical wall and segregation of data between it and its parent, IKB").

plainly wrong.  IKB's civil conspiracy claim is not independent but rather directly connected to the underlying fraud by S&P and the other Rating Agencies, such that S&P is liable for all the tortious conduct alleged in the Amended Complaint.  *See, e.g.*, Am. Compl. ¶ 286; *see Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 262 (S.D.N.Y. 2012) ("New York . . . does create vicarious liability for civil conspiracy on the part of defendants who conspire with tortfeasors to commit other actionable wrongs, including . . . fraud. . . . As Chevron has alleged causes of action for fraud . . . , the civil conspiracy claim is sufficient as against the Donziger Defendants"); *see also Kashi v. Gratsos*, 790 F.2d 1050, 1054 (2d Cir. 1986) ("Proof of a civil conspiracy under New York law connects a defendant with the transaction and . . . charges him with the acts and declarations of his coconspirators, and exposes that defendant to joint and several liability") (internal quotations omitted).

The cases cited by S&P are not to the contrary.  With respect to *Aetna Casualty*, neither the language quoted by S&P nor any discussion of civil conspiracy appears in the opinion. *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566 (2d Cir. 2005).  And *Kirch v. Liberty Media* merely affirmed dismissal of the civil conspiracy claim when the underlying tort claims were dismissed.  449 F.3d 388, 401 (2d Cir. 2006).[17]

---

[17] In the event that S&P's motion to dismiss is granted to any extent, IKB seeks leave to further amend its pleading to address any deficiencies.  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead") (citations omitted).

## <u>CONCLUSION</u>

For all of the foregoing reasons, IKB respectfully submits that S&P's motion to dismiss

should be denied in all respects.


Dated:  New York, New York
         July 24, 2014

                              WOLLMUTH MAHER & DEUTSCH LLP


                              By:_____/s/ David H. Wollmuth_____

                               David H. Wollmuth
                               William A. Maher
                               Jeffrey Coviello
                               Ryan A. Kane
                               Melissa A. Finkelstein
                               dwollmuth@wmd-law.com
                               wmaher@wmd-law.com
                               jcoviello@wmd-law.com
                               rkane@wmd-law.com
                               mfinkelstein@wmd-law.com

                               500 Fifth Avenue
                               New York, New York 10110
                               (212) 382-3300

                               *Attorneys for Plaintiff IKB Deutsche
                               Industriebank AG*

24